UNITED STATES of America, Appellee,

v.

Francis CURCIO, Gus Curcio, Dahill D'Onofrio and Roberto Garcia, Appellants.

Nos. 1304, 1307, Dockets 83–1024, 83–1065 to 83–1067.

United States Court of Appeals, Second Circuit.

Argued May 27, 1983.

Decided June 22, 1983.

Jacob D. Zeldes, Bridgeport, Conn. (Miriam Berkman, and Zeldes, Needle & Cooper, Bridgeport, Conn.), for appellants Francis Curcio and Gus Curcio.

Andrew B. Bowman, Westport, Conn., for appellant Dahill D'Onofrio.

Richard Reeve, Asst. U.S. Public Defender, New Haven, Conn., for appellant Roberto Garcia.

William C. Bryson, Atty. Dept. of Justice, Washington, D.C., for appellee U.S.

Before FEINBERG, Chief Judge, FRIENDLY and WINTER, Circuit Judges.

FRIENDLY, Circuit Judge:

This is the third time in which appellants Francis and Gus Curcio have been before us in this case, see 680 F.2d 881 (1982); 694 F.2d 14 (1982). They and their codefendants Roberto Garcia and Dahill D'Onofrio now appeal pursuant to conditional pleas of guilty under plea agreements made with the prosecutor and approved by Chief Judge T.F. Gilroy Daly of the District Court for Connecticut, from judgments of conviction entered on their guilty pleas. The appeals extend into new ground the conditional guilty plea, originally a judge-made creation so far as federal courts are concerned but now proposed to be sanctioned as Federal Rule of Criminal Procedure 11(a)(2).[1] We must carefully consider whether the proposed extension is proper.

*The Indictment and the Proceedings in the District Court*

The indictment, returned on January 13, 1982, contained seven counts. Count One charged all defendants with a conspiracy[2] wherein Francis Curcio would extend credit and direct the other defendants to extend

1. This was among the amendments to the Rules of Criminal Procedure transmitted by the Chief Justice to Congress pursuant to 18 U.S.C. §§ 3771 and 3772 on April 28, 1983; in the absence of congressional action, it will become effective on August 1, 1983.

2. A fifth defendant, Edward Vagnini, pleaded guilty to the conspiracy count of the indictment and was sentenced to two years imprisonment. He did not take an appeal.

credit with the understanding that delay in repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation and property of the debtors and others, and would demand weekly interest payments known as "vigorish" or "vig" payments which would extend the term of the loans, with the understanding of the defendants and the debtors that delay in repayment or failure to repay would have the described consequences, in violation of 18 U.S.C. § 892(a). The other counts charged substantive offenses in violation of 18 U.S.C. §§ 892 and 2. Count Two charged the Curcios, D'Onofrio and Vagnini with an extortionate extension of credit to John Acabbo; Count Three charged Francis Curcio and Vagnini with such an extension of credit to Richard Alchimio; Count Four charged the Curcios and D'Onofrio with such an extension of credit to Ronald Benedetto; Count Five charged them with such an extension of credit to Norman Ellsworth; Count Six charged them with such an extension to Darryl Hardiman; and Count Seven charged them with such an extension to Donald Brutnell.

Defendants moved to dismiss the indictment on the grounds, among others, (1) that 18 U.S.C. § 892(a) is void for vagueness; (2) that § 892(b), along with the definition of an extortionate extension of credit in § 891(6), creates an unconstitutional statutory presumption;[3] and (3) that prejudicial pretrial publicity required dismissal. In ad-

---

3. We quote below the relevant sections of 18 U.S.C. §§ 891 and 892:

§ 891(6) An extortionate extension of credit is any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person.

(7) An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person.

§ 892. Making extortionate extensions of credit

(a) Whoever makes any extortionate extension of credit, or conspires to do so, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

(b) In any prosecution under this section, if it is shown that all of the following factors were present in connection with the extension of credit in question, there is prima facie evidence that the extension of credit was extortionate, but this subsection is nonexclusive and in no way limits the effect or applicability of subsection (a):

(1) The repayment of the extension of credit, or the performance of any promise given in consideration thereof, would be unenforceable, through civil judicial processes against the debtor

(A) in the jurisdiction within which the debtor, if a natural person, resides or

(B) in every jurisdiction within which the debtor, if other than a natural person, was incorporated or qualified to do business

at the time the extension of credit was made.

(2) The extension of credit was made at a rate of interest in excess of an annual rate of 45 per centum calculated according to the actuarial method of allocating payments made on a debt between principal and interest, pursuant to which a payment is applied first to the accumulated interest and the balance is applied to the unpaid principal.

(3) At the time the extension of credit was made, the debtor reasonably believed that either

(A) one or more extensions of credit by the creditor had been collected or attempted to be collected by extortionate means, or the nonrepayment thereof had been punished by extortionate means; or

(B) the creditor had a reputation for the use of extortionate means to collect extensions of credit to punish the nonrepayment thereof.

(4) Upon the making of the extension of credit, the total of the extensions of credit by the creditor to the debtor then outstanding, including any unpaid interest or similar charges, exceeded $100.

(c) In any prosecution under this section, if evidence has been introduced tending to show the existence of any of the circumstances described in subsection (b)(1) or (b)(2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing the understanding of the debtor and the creditor at the time the extension of credit was made, the court may in its discretion allow evidence to be introduced tending to show the reputation as to collection practices of the creditor in any community of which the debtor was a member at the time of the extension.

dition, defendant Francis Curcio moved to dismiss substantive counts Three through Seven on the ground that the holding in *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), allowing a conspirator to be held liable for reasonably foreseeable substantive offenses of another conspirator in furtherance of the conspiracy, was unconstitutional. Chief Judge Daly denied the motions to dismiss in an opinion filed on September 23, 1982. Later, on December 3, 1982, he denied motions of the Curcios for reconsideration of his ruling with respect to pretrial publicity.

Three days later, on December 6, 1982, the United States, represented by William A. Keefer, an attorney from the Department of Justice,[4] signed detailed plea agreements with each of the four appellants. Francis Curcio's plea agreement recited that he would enter a guilty plea to Count Three of the indictment pursuant to *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970);[5] that the United States would recommend a sentence of six years imprisonment under 18 U.S.C. § 4205(b)(2) with the understanding that such recommendation would not bind the court; that the parties approved the right of the defendant to seek review of the issues summarized in an attached Exhibit A;[6] and that:

> The parties approve the right of defendant to seek timely review in accordance with the Federal Rules of Appellate

Procedure, of the issues summarized in the document attached as Exhibit A, as those issues are more fully set forth in defendant's pretrial motion papers, in the United States Court of Appeals for the Second Circuit. The United States represents that if the case were to proceed to trial it would be necessary to utilize both the provisions of 18 U.S.C. § 892(b) and the *Pinkerton* doctrine, *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), to establish a *prima facie* case against defendant Francis Curcio in count three.

The agreement also contained detailed provisions as to what should happen, both with respect to the remaining counts of the indictment and with respect to prosecutions for violation of other criminal laws, on various contingencies relating to the action of this court on appeal (not, however, including the contingency that we might hold that some or all of the issues listed in Exhibit A were improperly reserved) and of the Supreme Court on petitions for certiorari. The plea agreements with the other defendants were similar except that Gus Curcio and D'Onofrio were to plead guilty to Count Two and Garcia to Count One; that the recommended sentences were to be four years for D'Onofrio and one year for Garcia; and that Exhibit A attached to each agreement was limited to the first two questions listed in Exhibit A to the agreement with Francis Curcio and the represen-

---

**4.** The plea agreements were not signed by the United States Attorney for the District of Connecticut but Mr. Keefer represented to the district court that he had orally approved them.

**5.** The reference was doubtless to the holding in that case that, when the prosecution has substantial evidence of guilt, "An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." 400 U.S. at 37, 91 S.Ct. at 167.

**6.** This read:
1. Whether 18 U.S.C. § 891 and § 892(b) are constitutional. [Part A, Motion for Defendants Gus Curcio and Francis Curcio to Dismiss the Indictment, dated July 14, 1982.]

2. Whether the publicity, the charge to the Grand Jury and other conduct of the Government described in the record below require the dismissal of the indictment. [Parts D, E, G, Motion of Defendants Gus Curcio and Francis Curcio to Dismiss the Indictment, dated July 14, 1982 and supplemental motions to dismiss, dated July 19, 26, 28 and September 21, 1982.]

3. Whether the *Pinkerton* doctrine, set forth in *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), which the Government would use in counts three through seven to establish defendant Francis Curcio's guilt violates defendant Francis Curcio's rights so as to require dismissal of counts three through seven against him. [Part C, Motion of Defendants Gus Curcio and Francis Curcio to Dismiss the Indictment, dated July 14, 1982.]

tation by the United States was limited to its need to utilize 18 U.S.C. § 892(b) and made no reference to *Pinkerton v. United States, supra,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489.

The pleas of the two Curcios and Garcia were taken at a hearing on December 6, 1982; D'Onofrio's at a hearing on December 9. Francis Curcio's plea was taken first. The prosecutor, evidently to comply with Fed.R.Crim.P. 11(f), stated that the Government's evidence "would consist of testimony of an accomplice and debtor by the name of William Cray as well as at least six additional debtors, John Acabbo, Richard Alchimio, Ronald Benedetto, Norman Ellsworth, Darryl Hartman and Special Agent Donald Brutnell of the Federal Bureau of Investigation, plus testimony of other witnesses and participants to the events charged. All of which is corroborated by consentual [sic] tape recordings and physical evidence." This evidence was to be used to show that Francis Curcio "was in overall charge of the extortion conspiracy and that he had to personally authorize loans of the size over a few thousand dollars". The prosecutor also said that the Government's evidence would establish that Gus Curcio was "second in command of the extortion conspiracy with supervisory responsibility, that Dahill D'Onofrio acted as principal collector of the loans, and that defendants D'Onofrio, Vagnini and Garcia extended and collected loans under the supervision and control of the Curcio brothers", and that the evidence would show that none of the debts would have been legally enforceable in Connecticut.

Going into further detail, the prosecutor explained that his evidence would show that beginning in 1976, Acabbo began borrowing from Vagnini, who was working for Francis Curcio, with interest at the rate of 3% per week (156% per year); that on one occasion after Acabbo fell behind in his interest payments, Gus Curcio told him "not to mistake kindness for weakness"; that on another occasion when Francis Curcio told Acabbo that he owed $28,000 and Acabbo answered that he had already paid that much in "vigorish", Francis said that was "dead money"; and that on another occasion when Acabbo paid $3000 to Francis Curcio, Francis said Acabbo was not paying enough money on his debt. The prosecutor also described evidence with respect to a loan transaction, again involving 3% weekly interest, between Alchimio and Vagnini, who was acting on behalf of Francis Curcio. The prosecutor represented that Alchimio would have testified that at the time the extensions of credit were made, he believed that physical harm would come to him if he failed to repay the loans, and that this belief was based on his awareness of Francis Curcio's reputation in the community. Ellsworth would have testified that Cray had brought him to Gus Curcio and D'Onofrio for a loan, which was made at 4% interest per week (208% per year), and that he believed that Curcio and D'Onofrio would cause him physical harm if he failed to repay. Hardiman and Cray would have testified to a loan from D'Onofrio at 4% interest per week; Francis Curcio discussed the loan with Cray and when Hardiman left town before repaying the debt, Gus Curcio told Cray that he was "hunting for" Hardiman. The latter would have testified that he was aware of the reputations of Francis Curcio and D'Onofrio for violence and believed he would suffer broken bones in the event of a default. Cray also would have testified with respect to a loan by Gus Curcio and D'Onofrio to Benedetto at 4% per week which Cray guaranteed. Gus Curcio told Cray that he had to collect the interest, no matter what he had to do to get it. At one time when Benedetto fell behind in his "vigorish" payments, D'Onofrio told him that if these were not regularly made, Benedetto "could have a lot of broken bones." Brutnell, a FBI Special Agent acting in an undercover capacity would have testified that he asked D'Onofrio for a loan of $5000 to $10,000, that D'Onofrio said he had to get approval for the loan and sent Brutnell to see Gus Curcio who stated that he needed Francis' approval for a loan of that size, and that Francis later told agent Brutnell he was considering whether to make the loan.

Garcia was the next to plead. Presumably because his plea was to the conspiracy count, the prosecutor made no further proffer of evidence. Gus Curcio came next with a plea to Count Two. The prosecutor said that the Government's evidence on this count would revolve around Acabbo's borrowings from Vagnini whom Acabbo knew to be a loanshark working for Francis Curcio. In addition to what has been recounted above, the prosecutor said that Acabbo would testify that at the time when the extensions of credit were made, he believed that the Curcios had reputations for the use of threats and violence in the collection of loans. D'Onofrio's plea of guilty, also to Count Two, was taken on December 9. The prosecutor made substantially the same proffer with respect to the Acabbo loans that he had made before, and added that "the Government would further prove through other evidence and testimony at the trial a systematic extension of loans and collection of interest payments by the defendant D'Onofrio from at least four debtors in addition to John Acabbo".

On two occasions defendants' attorneys were asked by the district court if they had "any substantial disagreement with the Government's description of the proof it could offer at trial." The attorneys all responded "No", and one of them said "It is our contention, your Honor, that the Government could offer proof to that effect."

The district court, on December 9, 1982, entered an order approving the defendants' reservation for appeal to this court of the issues described in Exhibit A to their respective plea agreements. Later it sentenced them, increasing the sentences of Francis and Gus Curcio from the six years recommended by the Government to nine and eight years respectively and of Garcia from one to two years, and decreasing the sentence of D'Onofrio from the four years recommended by the Government to three. The four defendants then appealed, and their sentences have been stayed pending appeal.

*Discussion*

Before the argument of the appeal the court advised counsel by letter that they "should be prepared to address at oral argument the question whether, in view of *United States v. Burns,* 684 F.2d 1066 (2 Cir. 1982), and the cases cited therein, any or all of the issues raised on appeal were improperly reserved under the conditional guilty plea." The *Burns* court, speaking through Chief Judge Feinberg, elaborated on our concerns, previously voiced in *United States v. Lace,* 669 F.2d 46 (2 Cir.1982), and *United States v. Thibadeau,* 671 F.2d 75, 79–80 (2 Cir.1982), over the expansion of the conditional guilty plea from its historic use in preserving contentions collateral to the general issue, such as claims of constitutionally invalid searches, seizures and confessions or of bar by the statute of limitations to guilty pleas that are "subject to a large number and variety of conditions", 684 F.2d at 1071, or "that reserve an extensive number of issues for appeal." 684 F.2d at 1073. It particularly noted, *id.,* that

> Without careful supervision of the number and variety of issues preserved for appeal, the use of conditional guilty pleas is likely to result in appellate presentation of issues that cannot be adequately reviewed without a full trial record.

These concerns were reiterated in *United States v. Guerro,* 694 F.2d 898, 903 (2 Cir. 1982). Appellants' counsel addressed the issue in their reply brief and the matter was discussed extensively at oral argument, with the Government joining appellants in urging us to decide the issues reserved in the plea agreements.

I.

The most powerful argument made in favor of our deciding the reserved questions was the Government's contention, advanced at oral argument, that constitutional claims survive even an unconditional guilty plea. If that were true as a general proposition, it would indeed seem to follow *a fortiori* that a conditional plea reserving constitutional claims pursuant to a plea agreement should

survive,[7] since the appealable issues have been circumscribed and the Government is aware that the sentences recommended by it may not in fact have to be served. However, the legal principle is not so broad as the Government suggests.

The Supreme Court decision cited by the Government, *Haynes v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968), did hold, although only by unexplicated statement in a footnote,[8] that a plea of guilty did not foreclose an attack on the constitutionality of a provision in the National Firearms Act, 26 U.S.C. § 5851, which made it a crime knowingly to possess a firearm that had not been registered with the Secretary of the Treasury as required by 26 U.S.C. § 5841. Defendant had moved for dismissal of a count in an indictment charging this offense on the ground that compelling registration violated his Fifth Amendment privilege against self-incrimination, and pleaded guilty after his motion was denied. The reason for the sparse discussion of the survival of the constitutional claim is clear. The statute, as construed by the Court, punished conduct which the self-incrimination clause protected; *Haynes'* plea simply admitted conduct in which he was constitutionally privileged to engage. In contrast, defendants here do not contend that by a suitable statute Congress could not have made criminal the conduct which they have admitted by their guilty pleas.

*Haynes* is far from being the Supreme Court's latest word on the issue how far constitutional claims survive an uncondi-tional plea. The Court has dealt with the question in six later cases: *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (guilty plea under statute permitting death sentence if jury's verdict so recommended which had been held unconstitutional in *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968)); *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (guilty plea following confession whose voluntariness state offered no constitutionally valid means of testing); *Parker v. North Carolina,* 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970) (guilty plea under statutes whereby punishment on such a plea would be life imprisonment whereas after jury trial punishment would be death unless jury recommended life imprisonment);[9] *Tollett v. Henderson,* 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) (exclusion of blacks from grand jury); *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974) (prosecution's making more serious charge after defendant had exercised right to seek trial *de novo* in higher court); and *Menna v. New York,* 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975) (per curiam) (double jeopardy). In the first four cases the constitutional claims were held not to survive the guilty plea; in the last two, as in *Haynes, supra,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923, they were held to have done so. See also *Lefkowitz v. Newsome,* 420 U.S. 283, 95 S.Ct. 886, 43 L.Ed.2d 196 (1975). A valuable commentary distills the following as the guiding principle of these decisions:[10]

---

**7.** It has been argued that there is a constitutional right to plead conditionally guilty, at least in states in which defendants have the option to plead unconditionally guilty. Note, Conditional Guilty Pleas, 93 Harv.L.Rev. 564, 577–85 (1980).

**8.** This read, 390 U.S. at 87, n. 2, 88 S.Ct. at 725, n. 2:

> Petitioner's plea of guilty did not, of course, waive his previous claim of the constitutional privilege. See, e.g., *United States v. Ury,* 106 F.2d 28.

In *Ury* the contention was that the statute which defendant had pleaded guilty of violating went beyond the power of Congress under the commerce clause.

**9.** These three cases, decided on the same day in opinions by Justice White, are often referred to as "the Brady trilogy".

**10.** Westen, Away from Waiver: A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure, 75 Mich.L.Rev. 1214, 1226 (1977). Professor Saltzburg, disagreeing with much of Professor Westen's analysis, would nevertheless accept his formulation of the decisions if it were reworded to read:

> A defendant who has been convicted on a plea of guilty *and who has complied with pre-plea procedural rules regarding notice of constitutional claims* may challenge his conviction on any constitutional ground that, if

[A] defendant who has been convicted on a plea of guilty may challenge his conviction on any constitutional ground that, if asserted before trial, would forever preclude the state from obtaining a valid conviction against him, regardless of how much the state might endeavor to correct the defect. In other words, a plea of guilty may operate as a forfeiture of all defenses except those that, once raised, cannot be "cured".

Application of this formulation to the case in hand makes it clear that one of the asserted grounds of unconstitutionality, to wit, that § 892(b) creates an unconstitutional presumption, would not have survived an unconditional plea of guilty, since the Government might have made a prima facie case without relying on that subsection.[11] The appellants' unconstitutional presumption argument goes to the prosecution's method of proof and is thus governed by the holding in *McMann v. Richardson, supra,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763, that a claim of the constitutional invalidity of a confession did not survive a guilty plea. As said in *Menna v. New York, supra,* 423 U.S. at 62–63 n. 2, 96 S.Ct. at 242 n. 2, "a counseled plea of guilty is an admission of factual guilt so reliable that, where voluntary and intelligent, it *quite validly* removed the issue of factual guilt from the case." (emphasis in original). Francis Curcio's *Pinkerton* claim likewise would not have survived an unconditional plea of guilty since there would be nothing to show that the Government could not have produced direct evidence that he had committed or aided or abetted in committing the substantive crimes sufficient to avoid any need to invoke *Pinkerton.*

Appellants' other constitutional claim with respect to the statute, namely, that it is void for vagueness would seem to stand differently, at least if the claim is read to be, as we think it must, that the statute is so vague as to require nullification even at the instance of a defendant who knew that his actions were within its intended purpose. The same would seem to be true with respect to appellants' claim of prejudicial publicity if this is read to be, as again we think it must, that the effect of the publicity had been such that nothing short of dismissal of the indictment would do.

## II.

We need not decide, however, whether the void-for-vagueness and prejudicial publicity claims would have survived an unconditional plea of guilty, since we see no reason why either of these claims, at least if standing alone, was not a proper subject for reservation. The void-for-vagueness claim, read as we believe it must be, can be determined by analysis of the statute and, if appellants are right, would prevent them or anyone else from being convicted under it. As said in *United States v. Petrillo,* 332 U.S. 1, 6, 67 S.Ct. 1538, 1541, 91 L.Ed. 1877 (1947), an appeal from the dismissal of an indictment under the Criminal Appeals Act as it then stood, 18 U.S.C. § 682 (Supp. V. 1946), "no refinement or clarification of issues which we can reasonably anticipate would bring into better focus the question of whether the contested section is written so vaguely and indefinitely that one whose conduct it affected could only guess what it meant." We likewise do not see how a full trial could bring appellants' claim regarding pretrial publicity, in part allegedly the result of

asserted before trial, would forever preclude the state from obtaining a valid conviction against him *on the charge to which he pleaded,* regardless of how much the state might endeavor to correct the defect. (Emphasis in original).

Saltzburg, Pleas of Guilty and the Loss of Constitutional Rights: The Current Price of Pleading Guilty, 76 Mich.L.Rev. 1265, 1285–86 (1978). Professor Westen, repelling Professor Saltzburg's attack, nevertheless seems to ac-

cept the amendments, Forfeiture by Guilty Plea—A Reply, 76 Mich.L.Rev. 1308, 1310 (1978).

11. Not only does § 892(b) specifically declare that "this subsection is nonexclusive", but the legislative history recognizes that "it may be unnecessary for the prosecution to make use of sections 892(b) and 892(c)". Conf.Rep. No. 1397, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News at 1962, 2027.

prosecutorial misconduct, into sharper focus. This, as was the claim of prosecutorial misconduct before the grand jury in *United States v. Thibadeau, supra,* 671 F.2d at 80, is "an issue of constitutional dimension on which an adequate record has been developed". It is true that insofar as the claim at bar relates to the effect of adverse publicity on a trial jury as distinguished from a grand jury, the *voir dire* might have resulted in exclusion of members of the panel who had been tainted by the publicity or, if the taint was sufficiently general, in the transfer of the trial from Bridgeport, where the publicity had been centered, to one of the several other places fixed for holding court in the District of Connecticut or, on defendants' motion, Fed.R.Crim.P. 21(a), outside the district, in a continuance, or in both. However, in light of the contemplation of the plea agreement that no jury would ever be impaneled, the question reserved must be read to be that the pretrial publicity was so serious that none of these measures could repair the damage and that dismissal of the indictment was required.

We reach a different conclusion, however, with respect to the propriety of the reservation of the claims that § 892(b) works a shifting of the burden of proof in violation of *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and that the rule of *Pinkerton v. United States* is unconstitutional.

It is desirable at this point to analyze the former claim in somewhat more detail. Although appellants characterize § 892(b) as a "presumption", it certainly is not a "mandatory presumption", namely, a rule that "tells the trier that he or they *must* find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts." *Ulster County Court v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 2225, 60 L.Ed.2d 777 (1979). Rather § 892(b) creates a "permissive inference or presumption" namely, one "which allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind

on the defendant." *Id.* It is not important for our purposes whether § 892(b) is addressed solely to the court as the district judge thought, i.e., the court may not withdraw a case from the jury or set aside a guilty verdict when "it is shown that all of the following factors were present", or whether the court may or, at the Government's request, must charge the jury that it may consider the factors in deciding whether the prosecution has established an extortionate extension of credit as defined in § 891(6).

*Allen* makes plain that the constitutionality of Congress' having directed either of such courses of action is not to be decided *in vacuo.* Indeed, as pointed out in 1 Weinstein & Berger, Evidence under the United States Rules ¶ 303[05], at 303–25 (1982), the novelty of *Allen,* and the point on which the majority of five and the minority of four divided, was its holding that in determining whether a "permissive presumption" satisfied the rationality test "the proper evidence to scrutinize is *not* the general experience of the community or the validity of the legislative findings which support the presumption, but rather the evidence submitted in the particular case at issue." (Emphasis in original). A "permissive presumption" thus is valid unless *"under the facts of the case,* there is no rational way the trier could make the connection permitted by the inference." 442 U.S. at 157, 99 S.Ct. at 2224 (emphasis supplied). The Court went on to say that it had held "irrelevant in analyzing a mandatory presumption, but not in analyzing a purely permissive one, that there is ample evidence in the record other than the presumption to support a conviction", 442 U.S. at 160, 99 S.Ct. at 2226. Unsurprisingly, if a jury is instructed with respect to a "presumption", "the jury instructions will generally be controlling", 442 U.S. at 157–59 n. 16, 99 S.Ct. at 2224–26 n. 16. The *Allen* majority criticized this court for having passed on the constitutionality of a "permissive presumption" statute, to wit, a New York statute providing that presence of a firearm in an automobile is presumptive evidence of its

possession by all occupants, "on its face", 442 U.S. at 162–63, 99 S.Ct. at 2227–28. Instead the Court held that "[a]s long as it is clear that the presumption is not the sole and sufficient basis for a finding of guilt", it need meet only a "more likely than not" rather than a "beyond a reasonable doubt" standard, and, after analyzing the precise facts and jury instructions in *Allen,* concluded that the New York statute passed the test as there applied. It was this very approach that was attacked by the dissent, 442 U.S. at 173, 177, 99 S.Ct. at 2233, 2235.

█ Appellants' proposal that we determine the validity of § 892(b) apart from an evidentiary record and jury instructions invites the very "on its face" consideration of constitutionality which the *Allen* majority condemned. Under the majority's analysis, the rationality of § 892(b), whether it be called an inference or a permissive presumption, would vary with the facts. Its rationality would be much clearer in a case replete with evidence of defendants' use or threats of violence to effect collection than in one where there was no such evidence and the prosecution relied solely on evidence of the creditor's reputation. This need to know the evidence in passing on the constitutionality of a "permissive presumption" is not satisfied by the Government's representation in the plea agreements that "it would be necessary to utilize the provisions of 18 U.S.C. § 892(b) in order to establish a *prima facie* case." That representation would cover possibilities ranging from the Government's possession of evidence barely sufficient to trigger § 892(b) up to cases where the only deficiency was the lack of direct evidence of the creditor's

and the debtor's understanding. Neither can the evidentiary deficiency be cured by our relying on the prosecutor's proffers at the taking of the pleas and appellants' acquiescence in them. Counsel for appellants objects to our considering these, saying that his statement "reflected only a concession that the Government would attempt to offer such evidence—*not* an admission that the Government's version of the facts was accurate; that all of the proffered testimony would be relevant or admissible; or that appellants had in fact made the statements that the Government indicated that potential trial witnesses would attribute to them." Reply Brief, p. 3. On the other side, the prosecution indicated that the proffered evidence was not all that it had available. We are thus being asked to pass on a contention raising constitutional questions, governed by a Supreme Court decision that has been puzzling to commentators [12] and to courts,[13] which demand careful scrutiny of a trial record and instructions which do not exist. While the Government may be right in saying that the issue of the constitutionality of § 892(b) will not simply "go away" after a trial, a trial will develop the material which *Allen* held that reviewing a court must have before passing on that issue. The prosecutor and experienced defense counsel, whose brief cites *Allen* six times, should have known from a reading of that opinion that we could not properly pass on the abstract question with respect to § 892(b) here tendered. The district judge abused his discretion in accepting a plea permitting such a question to be put to us.[14] Compare *Sears,*

**12.** See, e.g., 1 Weinstein & Berger, *supra,* ¶ 303[05], at 303–23 ("an analysis which serves to confuse as much as to clarify the issues in this case"), 303–35 ("a troubling decision because the instructions given by the trial judge could well be read—as the dissenters argued—to have created a mandatory presumption, under the Court's own definition"); Allen, Structuring Jury Decisionmaking in Criminal Cases, 94 Harv.L.Rev. 321, 361–66 (1980); Nessen, Rationality, Presumptions, and Judicial Comment: A Response to Professor Allen, 94 Harv.L.Rev. 1574, 1574 n. 6 (1981).

**13.** See, e.g., *Hammontree v. Phelps,* 605 F.2d 1371, 1373 (5 Cir.1979) (Wisdom, J.) ("We skate on thin ice" with respect to statutory presumptions in criminal cases, ice that "was thinned" by the *Allen* decision.)

**14.** In addition to the specific warnings of *Allen* against a "facial" approach with respect to statutory "permissive presumptions", we might well be compelled to refrain from ruling on the abstract question tendered with respect to § 892(b) by the more general considerations against premature constitutional adjudication

*Roebuck & Co. v. Mackey,* 351 U.S. 427, 437, 76 S.Ct. 895, 900, 100 L.Ed. 1297 (1956) (Fed.R.Civ.P. 54(b)); *Cold Metal Process Co. v. United Engineering & Foundry Co.,* 351 U.S. 445, 452–53, 76 S.Ct. 904, 908–909, 100 L.Ed. 1311 (1956) (id.).

For similar reasons it was an abuse of discretion to permit Francis Curcio to plead guilty to the substantive offense charged in Count Three of the indictment but to reserve the question whether the holding of *Pinkerton v. United States,* 328 U.S. 640, 645, 648, 66 S.Ct. 1180, 1183, 1184, 90 L.Ed. 1489 (1946), on which the prosecutor represented he would be obliged to rely, should be overruled. In the absence of an evidentiary record we cannot say whether the prosecutor would have been able to invoke *Pinkerton.* As the Court there observed, 328 U.S. at 647–48, 66 S.Ct. at 1184:

> A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.

Moreover, the plea agreement, as we read it, would not be satisfied by our simply saying that we are bound by *Pinkerton;* rather we would be required to consider whether, as appellants argue in their brief, it should be overruled. This is a pastime in which we do not commonly engage, and a district court cannot create so unseemly a role for us. Curcio cites no instance where a lower federal court has avowedly disregarded a controlling decision of the Supreme Court, and the only instance that occurs to us is the action of a three-judge court in the second flag salute case, *Barnette v. West Virginia State Board of Education,* 47 F.Supp. 251, 253 (S.D.W.Va.1942), where indeed the effort proved successful, see 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed.

1628 (1943). The three-judge court explained the unusual course there taken on the basis that four of the seven Justices who had participated in the first flag salute case, *Minersville School District v. Gobitis,* 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940), had publicly expressed their disapproval with it, and the Court in a subsequent decision had distinguished *Gobitis* instead of relying on it. Nothing of this sort has occurred with respect to *Pinkerton.* Moreover, even in the wholly unlikely event that this panel wished to do what appellant asks, we would be obliged to seek the convocation of an *en banc* court to overrule this court's own decisions applying *Pinkerton,* e.g., *United States v. Finkelstein,* 526 F.2d 517, 522 (2 Cir.1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976); *United States v. Corr,* 543 F.2d 1042, 1050 (2 Cir.1975); *United States v. Molina,* 581 F.2d 56, 60 (2 Cir.1978).

Even if, contrary to our belief, we could comply with the reservation concerning *Pinkerton,* simply by adhering to the rule in that case as a matter of authority, the district court would still have abused its discretion by permitting the reservation. Unlike the frequent case where the maximum punishment under the general conspiracy section, 18 U.S.C. § 371 (fine of not more than $10,000 or imprisonment of not more than five years or both) is less than for the substantive crime, 18 U.S.C. § 892(a) authorizes the same penalties for conspiracy, to wit, a fine of not more than $10,000 or imprisonment of not more than 20 years or both, as for the substantive crime. In order to obtain a conviction under the substantive Count Three, to which Francis Curcio pleaded, by virtue of the *Pinkerton* rule, the Government would be obliged to tender evidence that would support a conviction under the conspiracy Count One, to which he was permitted not to plead. At a trial the Government could well have decided to drop the substantive

developed in Justice Brandeis' famous concurring opinion in *Ashwander v. TVA,* 297 U.S. 288, 341, 346–48, 56 S.Ct. 466, 480, 482–83, 80 L.Ed. 688 (1936) and cases there cited. See also *United States v. International Union, United Automobile, Aircraft and Agricultural Implement Workers,* 352 U.S. 567, 590–92, 77 S.Ct. 529, 540–41, 1 L.Ed.2d 563 (1957); *United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960).

counts against Francis; additional fines were all it could gain from convictions under them, as distinguished from the one under the conspiracy count which it had to prove in any event. If it did not follow that course, it could have chosen not to defend convictions on the substantive crimes on appeal rather than provide Francis Curcio with a vehicle for challenging *Pinkerton* in the Supreme Court. It will be time enough for the Court to reconsider *Pinkerton,* if it desires to do so, in a case where it has a full record and application of the rule would make some substantial difference. Lower courts should not lend their aid to efforts to present the Court with additional problems.

### III.

Having decided that the questions of void-for-vagueness and prejudicial publicity were properly reserved but that the questions of the constitutionality of § 892(b) and *Pinkerton* were not, we must decide whether we should answer the two former or simply remand with instructions, which defendants have properly requested (Reply Brief, pp. 22–23), to vacate the convictions and permit withdrawal of the guilty pleas. Although our views as to the impropriety of what was attempted here in the face of the warnings given in *United States v. Burns, supra,* 684 F.2d 1066, and other cases we have cited, would incline us to the latter course, we do not deem this to be proper since either of the first two grounds, if sustained, would result in dismissal of the indictment and defendants should not have to undergo an unnecessary trial if they are entitled to prevail. In fact, these questions do not require extensive consideration.

As said in *Colautti v. Franklin,* 439 U.S. 379, 390, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979):

> It is settled that, as a matter of due process, a criminal statute that "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," *United States v. Harriss,* 347 U.S. 612, 617 [74 S.Ct. 808, 811, 98 L.Ed. 989] (1954), or is so indefinite that "it encourages arbitrary and erratic arrests and convictions," *Papachristou v. Jacksonville,* 405 U.S. 156, 162 [92 S.Ct. 839, 843, 31 L.Ed.2d 110] (1972), is void for vagueness. See generally *Grayned v. City of Rockford,* 408 U.S. 104, 108–09 [92 S.Ct. 2294, 835–36, 33 L.Ed.2d 222] (1972).[15]

In invalidating the Pennsylvania statute there at issue, the Court relied heavily on the absence of a *scienter* requirement, saying that it had "long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea.*" 439 U.S. at 395, 99 S.Ct. at 685. In support of this the Court cited *United States v. United States Gypsum Co.,* 438 U.S. 422, 434–446, 98 S.Ct. 2864, 2871–2878, 57 L.Ed.2d 854 (1978); *Papachristou v. Jacksonville, supra,* 405 U.S. at 163, 92 S.Ct. at 843; and *Boyce Motor Lines v. United States,* 342 U.S. 337, 342, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952). As the Court recognized, the doctrine that a scienter argument may save a statute which might otherwise have to be condemned for vagueness stems from the plurality opinion in *Screws v. United States,* 325 U.S. 91, 101–02, 65 S.Ct. 1031, 1035–36, 89 L.Ed. 1495 (1945), which said:

> [T]he requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid.... The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware.

---

**15.** The Court added, 439 U.S. at 391, 99 S.Ct. at 683:

> This appears to be especially true where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights.

No such constitutionally protected rights are implicated here.

See also *United States v. DeStafano,* 429 F.2d 344, 347 (2 Cir.1970) (sustaining 18 U.S.C. § 894 against void-for-vagueness attack).

■ Although § 891(6), defining "an extortionate extension of credit" which is made criminal by § 892(a), does not use the adverbs "knowingly" or "wilfully" often employed in imposing a scienter requirement, that office is sufficiently performed by the requirement that the Government must establish that it "is *the understanding of the creditor and the debtor* . . . that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person." (emphasis supplied). The Government thus must establish that the defendant understood that his conduct could have the stated consequences. Under the cases which we have cited and are cited by them, this would normally suffice to avoid condemnation under the void-for-vagueness doctrine. The only difficulty apparent to us arises from the use of the verb "could" in the language of the statute. In strict theory any extension of credit "could" result in the use of violence or other criminal means to compel repayment; even a churchwarden who had made a non-interest bearing loan for wholly beneficent motives might be provoked into a violent response if the debtor showed no disposition to repay. But the possibility of such violence would not have been the *understanding* of the creditor and the debtor at the time the loan was made, as § 891(6) requires. Professor Tribe has written, American Constitutional Law 718–19 (1978), that outside the area of First Amendment concerns,

> the Supreme Court will not ordinarily invalidate a statute because some marginal offenses may remain within the scope of a statute's language. The conclusion that a statute is too vague and therefore void as a matter of due process is thus unlikely to be triggered without two findings: that the individual challenging the statute is indeed one of the entrapped innocent, and that it would

have been practical for the legislature to draft more precisely. (footnotes omitted)

See also Amsterdam, The Void for Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67, 86, 101 (1960). Appellants also argue that some of the requirements for the prima facie case set forth in § 892(b) are unconstitutionally vague and that this taints § 892(a). We find no force in this argument, because we are here concerned with the definition of the offense, not with the propriety of the inferences which the Government may seek to have drawn in proving it. We therefore reject appellants' argument that § 892(a) is void for vagueness "on its face".

■ Appellants' argument with respect to pretrial publicity revolves mainly around a mass of news articles, almost entirely in Bridgeport, Conn. papers, allegedly emanating from the Crime Task Force and the United States Attorney, which describe the investigation of the Curcios and others by them and by a grand jury, and the testimony of an expert that as a result they could not receive a fair trial. Most of the articles do not go beyond the proofs which the prosecutor proposed to offer at the trial and presumably presented to the grand jury, but some linked Francis Curcio to "the Genovese Crime Family headquartered in New York City." Much space is devoted to arguments concerning the degree of the Government's responsibility for the publicity, with the Government responding that most of the material could have been found in public sources, such as Judge Zampano's statements sentencing Francis Curcio for a similar crime in 1977, a memorandum of Judge Burns revoking his probation in 1980, and an answer filed by the Government on September 15, 1981, in an unrelated case. Appellants contend that not all of the material could have come from these sources. Whatever relevance all this might have to exercise of the court's supervisory power, compare *Rideau v. Louisiana,* 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963), even publicity partly engendered by the Government would not warrant the extreme remedy of dismissal of an indictment before a *voir dire.* We have emphasized

only recently the efficacy of the *voir dire* in cases (Abscam and Watergate) involving far more extensive publicity than occurred here. *Application of National Broadcasting Co.,* 635 F.2d 945, 953 (2 Cir.1980). If a *voir dire* should reveal that the publicity had created a taint more extensive than we would suppose, remedies such as a continuance or transfer of the trial to one of the four other places in Connecticut where court may be held, Hartford, New Haven, New London and Waterbury, 28 U.S.C. § 86, would be available. The Government challenged appellants to produce "a single federal case authorizing the dismissal of an indictment before *voir dire* has been conducted." (Brief, p. 37). The challenge went unanswered.

### CONCLUSION

Since we have held that appellants' claims with respect to the constitutionality of § 892(b) and Francis Curcio's claim with respect to the constitutionality of the *Pinkerton* doctrine were improperly reserved by them and have declined to answer these claims, we accede to their requests that we vacate their convictions on conditional pleas of guilty and remand to the district court with instructions to permit the pleas to be withdrawn. This case has been pending much too long, a year and a half since the indictment was filed, with three appeals to this court. Defendants should be required promptly to plead guilty or not guilty and, if the latter, to proceed to an early trial. The mandate shall issue forthwith.