**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Glenn W. HALL, Defendant-Appellant.**

**No. 1337, Docket 83–1071.**

United States Court of Appeals,
Second Circuit.

Argued May 24, 1983.

Decided Dec. 28, 1983.

James A. Fronk, Buffalo, N.Y., for defendant-appellant.

Stephan J. Baczynski, Asst. U.S. Atty., W.D.N.Y., Buffalo, N.Y. (Salvatore R. Martoche, U.S. Atty., W.D.N.Y., Buffalo, N.Y.), for plaintiff-appellee.

Before FEINBERG, Chief Judge, FRIENDLY and WINTER, Circuit Judges.

FRIENDLY, Circuit Judge:

Glenn William Hall, a previous visitor to this court, see *United States v. Hall*, 421 F.2d 540 (2 Cir.1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970),[1] appeals from his conviction in the District Court for the Western District of New York, also for the crime of bank robbery, 18 U.S.C. § 2113(a), this time on a plea of guilty. The plea was conditioned on the result of an appeal from Judge Elfvin's denial of a suppression motion. Both the motion to suppress and the plea agreement were oral.[2]

The robbery of The First Federal Savings and Loan Association of Rochester (First Federal) at Clarence, New York, on August 6, 1982, was virtually a replay of the robbery of The Merchants National Bank & Trust Co. of Syracuse at Cicero, New York, on December 12, 1968, of which Hall was previously convicted. In both instances a lone white male wearing a stocking mask over his face and carrying a weapon entered the bank, ordered the tellers to fill a bag with money, and then escaped by using a teller's car. While in the 1968 robbery a lead to the identity of the robber was given by an observant spectator outside the bank, on this occasion the lead came from an unidentified person who found enough resemblance in the surveillance photographs to inform the New York State Police, which in turn notified FBI Special Agent McCrary, that he believed Hall to be the perpetrator. A check of the FBI files disclosed Hall's commission of the very similar robbery in Cicero. McCrary then requested

---

1. We there affirmed Hall's conviction under 18 U.S.C. § 2113(a) for the robbery of The Merchants National Bank & Trust Co. of Syracuse, see *infra.*

2. The Assistant United States Attorney characterized the plea agreement as being conditioned on Hall's "being given the right to appeal [the district court's] Suppression Hearing." Transcript of Plea Agreement Hearing at 1 (Dec. 14, 1982). Defense counsel characterized the plea as "being conditioned on our taking an appeal from your Honor's decision which was filed on today's date . . . ." *Id.* at 2. The Assistant United States Attorney added "that in the event that there is a partial affirm [sic] and a partial reversal, that Mr. Hall will be permitted to withdraw the plea." *Id.* Judge Elfvin understood that "if there is any disturbance by the United States Court of Appeals of my decision filed today . . . Mr. Hall would be permitted to withdraw the plea." *Id.* Although no harm seems to have been done by the informality practiced here, we think it better that conditional pleas of guilty should be spelled out in a detailed stipulation.

On the other hand, we agree with our dissenting brother that under the decisions cited by him, which we strongly endorse, the district judge should not have allowed the plea to be taken on a basis that deprived us of the possibility of affirmance on the ground of harmless error. Our disagreement relates to the consequences. The error was in Hall's favor, not against him. We see no sufficient reason why he should be rewarded by being permitted to withdraw his plea, a year after the event, when, in our view of the case, his contentions are meritless and there is no need to resort to the principle of harmless error. The case is unlike *United States v. Curcio II,* 712 F.2d 1532 (2 Cir.1983), where we vacated convictions based on conditional pleas of guilty because we could not properly decide certain reserved issues in the absence of a trial record.

the Erie County Sheriff's Department to search its records concerning Hall. The Department advised McCrary that it had an arrest warrant outstanding against Hall on a bad check charge and planned to execute the warrant that day.

When two deputies from the Sheriff's Department went to Hall's home to execute the arrest warrant, they invited McCrary to accompany them. The deputy sheriffs approached Hall outside his home, told him that he would have to come with them to the Lancaster Village Police Department, and informed him that he could post a proper bond. Hall asked to be driven to his van, which was under repair at a local garage, in order to obtain a registration card for use as security—a request showing a degree of familiarity with criminal procedure. The deputies complied with the request. After he had obtained the registration, Hall was driven to the Lancaster Police Department. He was never cuffed or restrained, and there was no discussion of the First Federal robbery. After being booked and fingerprinted, he was placed in an open waiting room.

McCrary's direct testimony at the suppression hearing was that he entered the room shortly thereafter and told Hall that he wished to speak to him about the First Federal robbery. McCrary immediately began advising Hall of his constitutional rights as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After he had gotten as far as warning that Hall didn't have to speak to him but had the right to remain silent, Hall began talking, while McCrary continued administering the warnings. The gist of Hall's talk, as recounted by McCrary, was "that the F.B.I. had arrested him for a bank robbery previously and that he didn't like the way he was treated in the past by the F.B.I. and that he felt that we were out harassing him, trying to tie him into a bank robbery this last Friday and denied any involvement in it, and so forth." [3] McCrary

told Hall that he was in charge of the investigation of the First Federal robbery for the FBI, was going to resolve it and wanted to get to the bottom of the situation regarding Hall as a suspect. Running true to his 1968 form, Hall said that was fine.

McCrary asked if Hall had any cash on his person; Hall said he did. McCrary asked if he could see it; Hall said he could. Hall then reached in his pocket and handed McCrary $195 in currency. Seeing three $20 bills, McCrary checked them against the list of such bills included in the bait list of the money taken from the bank and found that one was in the list. When McCrary confronted Hall with this and asked whether there was a logical explanation for Hall's possession of the money, Hall first sought and received an opportunity to check the bill produced by him against the list and then requested a few minutes to think it over before he said anything else. After the few minutes, Hall said, without further comment by McCrary, "Well, okay, I robbed the bank."

McCrary stopped the interview temporarily, and then proceeded to give Hall the *Miranda* warnings again. Hall said he wished to be fully cooperative. McCrary suggested that Hall make available any money left from the robbery as well as the handgun he had used. Hall said he would call his wife and ask her to bring them down, as she later did. The money included eight more $20 bait bills.

McCrary and the Erie County deputy sheriffs then took Hall to the FBI office. Two Advice of Rights forms were produced. One was given to Hall; FBI Agent Mount read from the other. Hall indicated that he understood his rights, as he had previously done at the Lancaster Police Department. Hall then signed the portion of the form entitled "Waiver of Rights". After questioning by the two FBI agents, McCrary wrote out a full confession which Hall

---

**3.** Hall's reference to not liking the way in which the FBI had treated him in the past could well have been to their having questioned him in connection with the Cicero robbery for 17

minutes before giving any *Miranda* warnings, see 421 F.2d at 542. We sustained this on the basis that, as there found by the district judge, Hall was not then in custody, *id.* at 543–46.

signed, after listening to McCrary's reading it back to him.

McCrary was subjected to extensive cross-examination. This elicited a number of facts not fully covered in his direct testimony. After McCrary had told Hall he didn't have to talk if he didn't want to but that McCrary would like to ask some questions if he would answer, Hall said that he wasn't involved and that he was willing to talk about the robbery. Although McCrary had mentioned only Hall's right to remain silent before Hall started talking, McCrary eventually went through each right but didn't stop to ask whether McCrary understood since Hall was talking simultaneously. Because of this McCrary couldn't be sure how much Hall had heard or understood. McCrary never expressly asked Hall at the Lancaster Police Department to waive his rights; this was because he believed that Hall had indicated his desire to talk at the beginning and kept repeating the desire thereafter. Hall was "defensive" and "nervous" during the period before his production of the currency.

After summarizing the facts, Judge Elfvin characterized Hall's contentions as follows:

> Hall's contentions are that he was not advised of his constitutional rights prior to custodial interrogation. He claims that he was compelled to hand over the tainted bill and that he confessed to the robbery unknowingly and that, although he then was advised of his rights, the production of the valise and the gun and the subsequent full confession all were "fruits of the poisonous tree"—*i.e.,* that all of the latter flowed from the earlier

unconstitutional behavior on the part of the agent.

After criticizing Agent McCrary for having made use of the outstanding bad check warrant to place Hall in custody, a criticism in which we do not join,[4] and for acting "not at all maturely" in his initial administration of the *Miranda* warnings, he nevertheless found that Hall was understanding of his rights. He referred to the fact that Hall "was not virginal in his relationship with police and other law enforcement personnel", having been earlier convicted of bank robbery.[5] The judge continued that while Hall may have been defensive and nervous in his initial conversation with Agent McCrary, "what he was saying to the agent was that he knew what his rights were and that he was aware that the agent was not his friend and that he was cognizant that the agent would use anything he might say against him." The judge pointed out that when Hall was "braced" by the agent's unexpected discovery that one of the bills handed over by him was bait money, "he didn't panic; he himself examined the bill and checked it against the bait money list. Even then he was in control of himself; he wanted a moment to think about the predicament after which he calmly said that he had robbed the bank." The judge concluded:

> As salutary as it is that the policeman clearly and succinctly spell out to the caged suspect each and every of his constitutional rights and ascertain that the one to be questioned understands them, it is truly only the latter that is important. If he who is being questioned knows what his rights are and gives incriminating re-

---

4. Indeed, Agent McCrary stated that the deputy sheriffs had told him that they planned to execute the outstanding warrant on the very day that McCrary spoke with them. Apart from this "coincidence," a term used by Judge Elfvin, Deputy Sheriff Wlodarczyk testified that it was not uncommon for the Sheriff's Department to invite an FBI agent along on such calls which involved suspected bank robbers. This was presumably a courtesy recognizing the federal law enforcement interest involved. We have often applauded cooperation by state and federal law enforcement agencies.

5. The real point was not simply the previous conviction for the same type of crime but the fact, as indicated *supra* note 3, that the main issue on Hall's previous appeal concerned *Miranda.* Hall had been effectively represented in that appeal by William B. Mahoney, a leading member of the Buffalo, New York, criminal defense bar, and it is inconceivable that he did not give Hall a thorough education about *Miranda.*

sponses, it is legally sufficient. Hall was such a person.

Hall's appeal is predicated primarily on McCrary's conduct of the initial interview at the Lancaster Police Department. The contention is that even if McCrary advised Hall of all his *Miranda* rights, the evidence does not support a conclusion that Hall understood them and voluntarily determined to confess. Proceeding from this premise, Hall argues that the additional currency and the gun produced from Hall's home and the subsequent written confession must be suppressed as fruits of the poisonous tree. Hall also contends that the $20 bill he produced prior to his oral confession must be suppressed since he "could not have voluntarily consented to the search and seizure of the bill."

## DISCUSSION

The issue whether Hall's oral confession should have been suppressed divides itself into three sub-issues:

(1) Was Hall warned concerning his rights in accordance with *Miranda?*

(2) Did he understand what his rights were?

(3) Did he voluntarily waive them?[6]

■ The first sub-issue is readily resolved. Agent McCrary, who strikes us as having been a painstaking and candid witness, testified positively that, despite the obstacle created by Hall's diversionary tactic, he succeeded in placing before Hall each of the rights specified in *Miranda.* His testimony in this respect was not seriously challenged. The only person who could have successfully contradicted him chose not to do so, defense counsel stating "that there's no need to. The record here has clearly been established." Transcript of Suppression Hearing at 106 (Sept. 13, 1982). Although counsel was free to make this tactical choice, the record is what it is. While the district judge did not expressly find that the warnings had been given, this

is implicit in his opinion. Such a finding may not be reversed on appeal unless clearly erroneous. *United States v. Montes-Zarate,* 552 F.2d 1330, 1331 (9 Cir.1977), *cert. denied,* 435 U.S. 947, 98 S.Ct. 1532, 55 L.Ed.2d 545 (1978); *United States v. Barrett,* 703 F.2d 1076, 1086–87 (9 Cir.1983).

■ ■ The second sub-issue is a shade more debatable. We begin with the fact that *Miranda* does not require the interrogator to ask the suspect whether the latter understood each of the rights, although it is doubtless good police practice to do this when the circumstances permit. It is claimed that Hall could not have understood his rights since he was talking for most of the time when McCrary was advising him, and stress is placed on McCrary's admission that he could not say whether or not Hall understood what he was being told. The argument defies human experience; in no inconsiderable proportion of conversations, including many in our courtroom, two—or even more—people are talking at once, without thereby eliminating their power of understanding what is being said. McCrary was able to understand what Hall was saying at the same time that he was advising Hall of his rights; there is no *a priori* basis for concluding that Hall could not have performed as well. Beyond this, there is force in the judge's observation that Hall knew his rights all along since he was not "a newcomer to the law", *United States v. Watson,* 423 U.S. 411, 424–25, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); *United States v. Isom,* 588 F.2d 858, 862 (2 Cir.1978), and, more important, no newcomer to the jurisprudence of *Miranda,* see *supra* note 5. McCrary's admission that he could not tell whether or not Hall had understood was simply an honest concession of his inability to penetrate Hall's brain; McCrary also testified that Hall admitted understanding the second set of oral *Miranda* warnings given later that same afternoon. Again the person in the best—indeed here in the only—

6. Analytically sub-issues (2) and (3) are part of the issue of waiver, since under the classic formulation of *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), a waiver of

rights could not be found unless the suspect knew what they were. However, it is convenient to treat the two points separately.

position to know what Hall's understanding was, chose not to testify at the suppression hearing. See *United States v. Foskey,* 636 F.2d 517, 522 (D.C.Cir.1980). The district judge's finding that Hall understood the first set of warnings is likewise a decision of fact which we may overturn only if clearly erroneous. *United States v. Boston,* 508 F.2d 1171, 1175 (2 Cir.1974), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975); *United States v. Isom, supra,* 588 F.2d at 862; *United States v. Guerrero-Herrera,* 590 F.2d 238, 242 (7 Cir. 1978). In our view the finding that Hall understood his rights before making the oral confession not only was not clearly erroneous but was thoroughly justified.

■ This brings us to the issue of waiver. Here the most recent guidance from the Supreme Court is *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). After referring to the statements on this subject in *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628, the Court characterized these as follows:

> Thus, the Court held that an express statement can constitute a waiver, and that silence alone after such warnings cannot do so. But the Court did not hold that such an express statement is indispensable to a finding of waiver.

441 U.S. at 373, 99 S.Ct. at 1757. The Court went on to hold that

> [t]he courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

*Id.* (footnote omitted).

The circumstances here pointed strongly to waiver. After having been told of his rights, Hall voiced agreement with Agent McCrary's plan to "get to the bottom of the situation" including his own position as a suspect. Then came the voluntary production of the currency and what must have been the unpleasant surprise of finding that it contained a $20 bill of bait money. Hall, as the judge said, "didn't panic". Rather he carefully examined the bill and checked it against the bait money list. After that he sought and received time for further reflection. Again, while we do not have an explicit finding of waiver from the district judge, this is implicit in his ruling. As said by Chief Judge Coffin in *United States v. Kiendra,* 663 F.2d 349, 351 (1 Cir.1981), a district court's finding of waiver "is to be upheld if any reasonable view of the evidence supports it" and "any specific findings of fact made after a hearing are binding unless clearly erroneous." See also *United States v. Guerrero-Herrera, supra,* 590 F.2d at 242; *United States v. Smith,* 608 F.2d 1011, 1013 (4 Cir.1979); *United States v. Dufur,* 648 F.2d 512, 514 (9 Cir. 1980), *cert. denied,* 450 U.S. 925, 101 S.Ct. 1378, 67 L.Ed.2d 355 (1981); *United States v. Dennis,* 701 F.2d 595, 597–98 (6 Cir.1983); *United States v. Vera,* 701 F.2d 1349, 1364 (11 Cir.1983).

■ Since there was no error in this denial of Hall's motion to suppress his oral confession, there was equally none in the denial of his motion to suppress its fruits, concerning which Hall advances no independent claims of illegality. That leaves only the refusal to suppress the $20 bill. There were ample grounds for concluding that Hall's production of this was voluntary under the totality of the circumstances. Assuming this to have been a search, the requirements laid down for consent to custodial searches in *United States v. Watson,* 423 U.S. 411, 424–25, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976), were met. See also *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

Affirmed.

WINTER, Circuit Judge, dissenting:

I respectfully dissent.

Were this case before us on appeal from a jury verdict, I would have no problem whatsoever in affirming the conviction. The first bait bill was admissible for reasons stated in Judge Friendly's opinion. The subsequent written confession and incriminating evidence produced by Hall's wife were admissible in light of the valid

intervening *Miranda* warning. *Tanner v. Vincent,* 541 F.2d 932 (2d Cir.1976), *cert. denied,* 429 U.S. 1065, 97 S.Ct. 794, 50 L.Ed.2d 782 (1977). Given the admissibility of overwhelming evidence of guilt, the conclusion that use of Hall's initial oral confession was harmless error beyond a reasonable doubt would be well-nigh unassailable. *See United States v. Moody,* 649 F.2d 124, 127–28 (2d Cir.1981).

However, this eminently sensible rationale is denied to us because the district court accepted a conditional plea of guilty which artificially structures the issues before us. Because the plea was conditioned upon Hall's right to withdraw if *any* portion of the district court's decision on the motion to suppress was disturbed on appeal, whether or not the particular error was harmless, we cannot dispose of this appeal without determining the admissibility of the initial oral confession. I believe it was an abuse of discretion for the district court to accept such a plea.

The plea agreement left Hall free to withdraw his plea if any one of four distinct evidentiary offerings (oral confession, bait bill, written confession, evidence produced by Hall's wife) was found to be inadmissible. There was, therefore, no "single pretrial issue that all sides recognized would be dispositive of the entire case," *United States v. Lace,* 669 F.2d 46, 57 n. 7 (2d Cir.) (Newman, J., concurring), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982), and "[p]leading guilty with a reservation of appellate rights ... [was] a device to circumvent the harmless error rule." *Id.* This case is thus exactly the one feared by Judge Newman in his concurrence in *Lace,* which has been favorably cited in *United States v. Burns,* 684 F.2d 1066, 1071 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983), and in *United States v. Thibadeau,* 671 F.2d 75,

79–80 (2d Cir.1982). I would not treat those decisions as empty rhetoric.[1] We can hardly expect district courts to heed their admonitions when we disregard them in practice.

*Burns* and *Thibadeau* fully rehearsed the dangers of misuse of conditional pleas, 684 F.2d at 1071–73 and 671 F.2d at 79–81, and I will not repeat them here other than to note their complete applicability to the present case. Resolving the admissibility of the initial oral confession is necessary only because of the terms of the conditional plea. Since the evidence as to whether Hall heard and thus understood the *Miranda* warning was in equipoise, the issue, when unpacked, involves the weight a fourteen year old conviction should carry in determining whether a suspect knows and understands those rights. This is not an issue with an obvious result, and, while Judge Friendly's opinion is not unpersuasive, it is unprecedented. Since the question arises only because of the conditional plea agreement, I would not reach it.

---

1. That the majority "strongly endorse[s]" *Burns* and *Thibadeau* does not alter the fact that they do not follow them. Acceptance of the plea was of course in Hall's favor but that observation dodges rather than responds to my point. A plea agreement is always in a defendant's favor else it would not be executed. In the present case, for example, the agreement enabled Hall to focus his attack upon the weak-

est link of the government's case, namely the oral confession. My point is that such agreements ought not be accepted where they allow the parties to structure the issues artificially.