UNITED STATES of America

v.

**Didier ALBA, John Gonzalez, Marizol Vasquez.**

**Crim. No. H–89–79(PCD).**

United States District Court, D. Connecticut.

March 15, 1990.

Hubert Santos, M. Donald Cardwell, Hartford, Conn., for defendants.

## RULING ON PENDING MOTIONS

DORSEY, District Judge.

Pending are motions of defendants:

(1) Alba, joined by Vasquez, to suppress tangible evidence.

(2) Gonzalez to suppress tangible evidence and statements. After a hearing and consideration of the briefs filed, this will constitute the findings and determination of each motion.

Defendants are charged with attempted possession with intent to distribute and distribution of cocaine, Count Two, and conspiracy for the same purpose, Count One.

These charges arise from a reverse sting whereby a confidential informant, after a series of discussions, arranged to sell ten kilograms of cocaine to Alba, who lived in Lebanon. It came to be agreed that the two would meet at the Sheraton Hotel in Windsor Locks to complete the sale on September 21, 1989. On that day, agents commenced a surveillance of Alba and followed him. He was observed to meet Gonzalez and in separate cars the two drove to the Sheraton. Gonzalez remained in his car in the parking garage while Alba met the

informant, who was accompanied by Sgt. Lavin of the Connecticut State Police, in the hotel lobby. Alba took the informant and Lavin to Gonzalez' car to show the money, which was in a cereal box which was originally in a bag on the rear seat. Gonzalez joined Alba in showing the money, represented as $60,000. Lavin, and the money, then remained with Gonzalez. The two merely sat in the car while the informant and Alba returned to the lobby. Gonzalez told Lavin to stay calm when Lavin asserted nervousness over the conduct of the transaction. Gonzalez noted the plan was that he would take the cocaine from the Sheraton to his home. Gonzalez was then under no actual or observable restraint or suggestion thereof. There was nothing done or said by Lavin, who continued his pose as associated with the seller, did not disclose his police office, and conducted himself solely as if the sale was to be accomplished, to suggest that Gonzalez was in any manner restrained or other than at complete liberty to go or come as he chose. Lavin expressed, and had no view that Gonzalez could not leave.

In the lobby, the informant called Agent Giandana, playing the role of guardian of the cocaine. She brought a package, purportedly containing the cocaine to be given to Alba. As the three exited the lobby, headed toward the garage, Alba was arrested by another agent. In the meantime, Gonzalez was arrested in the garage. He appeared to have spotted the surveillance team and reached, within the car, as if for a gun. The vehicle was searched and the cereal box with the money, but no gun, was found.

Gonzalez was informed of his *Miranda* rights promptly after his arrest. *See* Exhibits B and C. He was not asked to, nor did he, sign a form acknowledging and waiving his rights. He was told he had the right to remain silent and that anything he said could be used against him. He was told he had the right to counsel. He was not specifically told that he could stop answering questions. He was asked if he understood his rights as given. He said he understood. He made no request for an attorney. He never requested that the agents stop asking questions. He was taken to Hartford and en route he was also informed of his rights. Though he is Hispanic, Gonzalez speaks and understands English without difficulty. At the DEA office, when asked, he said he understood the rights of which he had been properly advised.

When Alba was arrested, he was carrying a box. He was not immediately advised of his *Miranda* rights. He spontaneously said something when advised of his arrest, but not in response to a question. He was put in a state police cruiser, then transferred to an agency vehicle for transport to Hartford. In the vehicle he was advised of his rights. He said he understood English and his rights. He was not then questioned, but he asked why he was arrested as he had nothing on him. He was told the agents knew of his purpose of purchasing cocaine. He noted Gonzalez was present to carry the money to protect against a rip-off. At the DEA office he signed an FBI waiver form, Exhibit 1. He read it and said he understood it.

Alba testified that he spoke English. He claimed he was not informed of his rights. He claimed not to be able to read English and signed Exhibit 1 without understanding it. His testimony in this respect is not credited. He never told his attorney he could not read English. He also told a story of his involvement in the deal in question that defies logic. He asserted Gonzalez' lack of knowledge of the deal and that Gonzalez was to get nothing. This is contrary to Gonzalez' version.

*Discussion*

Alba

Although at the hearing there was some assertion of a non-voluntary statement by Alba, he has now waived any such claim. He also questioned the validity of the search of his residence based on his claim that he received no copy of the warrant and Fed.R.Crim.P. 41(d) was not complied with. He has, by letter of counsel filed in court, withdrawn that claim and asserts no involuntary consent to any procedure by the agents.

Alba's claim of a search of 79 South Ridge Avenue, Willimantic, without a warrant is not substantiated. Likewise his claims as to the form of the warrant, its acquisition, and its execution have not been substantiated. To the extent it has not been waived and as a proper warrant has been demonstrated, the motion to suppress tangible evidence is denied.

■ Alba's claim as to any statements made is likewise unfounded. Anything he said before he was placed in a car for transport to Hartford was spontaneous on his part and not the result of custodial interrogation. He was given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in that car and at the DEA office. *See* Exhibit 1. Accordingly, there is no legal basis shown to warrant exclusion of anything he said thereafter.

### Vasquez

This defendant has made no showing beyond that of her co-defendant, Alba, whose motions she has adopted and joined. Absent a showing of violation of any rights personal to her and for the reasons for denying Alba's motions, all motions she may be deemed to have made are denied.

### Gonzalez

■ To the extent he has challenged the availability of evidence seized pursuant to the search, as he has made no claim nor showing beyond that of Alba, his motion to suppress the fruits of a search of his home, authorized by a warrant, which is not shown to be infirm, is denied. He claims in his brief that probable cause was not shown on the application for the warrant. It is true that Alba was the principal target of the investigation and the information developed prior to issuance of the warrant focused on him. Nonetheless, Gonzalez was described as driving separately, but with Alba, to a point where the drug transaction was to be consummated by Alba. The money was in Gonzalez' car. Alba got the money from the car. The transaction and the money were discussed in Gonzalez' presence without protest or disavowal by him. He sat with the money and Sgt.

Lavin while Alba went to see and receive the cocaine with a reasonably inferable, if not clear, understanding that the money, kept in his car, under his cognizance, if not custody and control, would be turned over when the cocaine delivery was complete. His conversation with Sgt. Lavin confirmed his knowledge of the deal in process and his further role with the cocaine after it was delivered in bringing it to 79 South Ridge Drive, Willimantic. Gonzalez was not merely the driver of a car. As a player in the distribution of drugs, thus established, probable cause for the search of his residence, seeking evidence confirming that role, was established. The proposed sale of nine to ten kilograms of cocaine on September 21 established a substantial drug distribution propensity and capability in Alba and anyone associated with him. Gonzalez was shortly to be so involved and likely to be thereafter involved. One involved in such a magnitude of drug dealing is likely to have been previously so engaged giving rise to the reasonable prospect of finding evidence confirming same at his home. That Gonzalez was known to be involved with Alba only from what happened on September 21 is not preclusive of his having a role in the substantial drug distribution with which Alba was involved and with which he had associated himself. In short, he was shown to have known a large amount of money, with which he was entrusted, was brought to the Sheraton to buy a large amount of cocaine, which thereafter would involve substantial activity to distribute, an undertaking which he joined by word and deed. The recitation in the affidavit was sufficient to permit the magistrate to find, as he did, that there was a substantial basis to conclude that Gonzalez' home would contain items confirming and likely to be present for use in the distribution in which he embarked, if he had not long prior been involved. Further, there is nothing to suggest that the officers' submission to the magistrate was in any way deficient as to bar their objectively reasonable reliance on the magistrate's finding of probable cause and issuance of the warrant. The motion to suppress the fruits of that search is denied.

■ Gonzalez further moves to suppress statements made after his arrest on September 21 for incompleteness of the warnings given and a non-waiver, presumably of the rights of which the warning was inadequate. Specifically, Gonzalez claims that he was not informed of his right to cut off questioning. As to any statements made by Gonzalez in his car to Sgt. Lavin, they were not the result of a custodial interrogation. As noted above, he was not then in custody. There was no basis for any reasonable belief that he was in any way under any restraint while he sat in his car with Lavin. Further, there was no questioning, only general conversation. Lavin's assumed role. Any such statements will not be suppressed. *Minnesota v. Murphy*, 465 U.S. 420, 429–34, 104 S.Ct. 1136, 1143–46, 79 L.Ed.2d 409 (1984).

■ Thereafter, he was arrested and warned, more than once. That is not disputed. What is also not disputed is that he was told that he had the right to remain silent and that anything he said could be used against him. Thus, the claim pertains to what he was not told. The agent did not tell him that he had the right to stop answering questions at any time. The genesis of the defendant's right is the fifth amendment right against self-incrimination. An accused cannot be forced to give testimony against himself. To ensure that right, which of course can be waived, the right to know and understand the scope of the fifth amendment protection was proclaimed in *Miranda*, which set a threshold of conduct required of law enforcement officers, the purpose of which was to ensure that one in custody, if questioned, would understand his rights.

Instead of blithely assuming such understanding and automatically finding a waiver when questions were asked, the Supreme Court required that an accused be informed in a manner that would essentially ensure his awareness of his rights. This was to be accomplished by certain specific advice, required to be given to an accused before any custodial questioning, absent which any answers were barred from trial use. The advice has come to be colloquial-

ized as the *Miranda* warnings. If he has been warned in compliance with *Miranda*, then a defendant's answers to questions would be admissible at first blush and absent other facts suggesting lack of understanding or an involuntary waiver. The warnings specifically mandated included the right to remain silent and that anything said could be used against him. *Miranda*, 384 U.S. at 468–69, 86 S.Ct. at 1624–25. These and the warnings concerning counsel are "an absolute prerequisite to interrogation." *Id.* at 471. The court went on to explain and amplify how the right to these warnings would be enforced. Thus, "[o]nce warnings have been given ... [i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74, 86 S.Ct. at 1627. This scenario is described as an "exercise [of] his Fifth Amendment privilege." *Id.* It is thus not described as a separate right, explicit warning of which is required. Rather, it is noted as a circumstance, conduct on the part of an accused, i.e., a declaration of a wish not to be interrogated further, which constitutes the exercise of the fifth amendment right whereupon interrogation must cease. If an accused so states, further questioning would only extract further information involuntarily in contravention of his right against self-incrimination. There is nothing in *Miranda* which requires a statement that one who answers questions has the right to stop doing so. An assertion of the right after some questions have been answered, it bars further questioning as would any refusal to answer questions. It is not a separate right. It is described in *Miranda* as an invocation of the right. It is not described as a distinct right requiring a distinct articulation of it as part of the required warnings. Here, the agents told Alba that he had the right to remain silent and that anything he said could be used against him. That warning encompassed the right to commence remaining silent even in the course of answering questions. Had he expressed a wish to exercise his right to remain silent in the course of questioning, and the questioning nonetheless

continued, then as the court indicates in *Miranda* his right to silence would have been violated, no waiver of that right could be found and the answers would have been inadmissible. He did not state such a wish in the course of his interrogation here. Thus, his rights under *Miranda* were not violated. He is not entitled to a separate specific warning of the right to invoke silence at any time even after he has answered some questions. There are numerous circumstances and ways in which the right to silence may be invoked and officers could not possibly warn of all of them. Having advised of the essential rights, the officers are not obliged to warn of any or all of the circumstances or manners in which the right may be invoked. Contrary to Gonzalez' claim, the right to cut off questioning is not "one of the essential Fifth Amendment rights," Brief at 4, but is a way in which he might have manifested his wish to invoke his right to remain silent. Thus, only if he had done so and his right not been honored would he have a valid claim under *Miranda*. As that is not the case here, the failure to specifically so advise him does not constitute a violation of his fifth amendment right. *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), is not to the contrary, as it merely reiterated the holding that the failure to cut off questioning when the wish to that effect is articulated violates the right to remain silent. Nothing in *Mosley* articulates a right to a specific warning of the right to stop answering questions. Indeed, *Miranda* is characterized as requiring officers to "give certain specified warnings," *id.* at 99, 96 S.Ct. at 324, which do not include the warnings claimed here. *Id.* at 100 n. 6, 96 S.Ct. at 324 n. 6; *see Doyle v. Ohio*, 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91 (1976). All of the cases emphasize the importance of the right and the need for scrupulous adherence tnor the right. None but a scattering of state court decisions have broadened *Miranda* as defendant would do. No federal courts have sustained defendant's argument. With all due respect to the state courts cited by defendant, it is found that they have read *Miranda* more broadly than its language warrants.

■ Defendant makes a separate argument that he did not knowingly waive his fifth amendment right. His claim is based on the fact that the only showing of a waiver is that defendant answered questions. It is of course true that the government's "burden [of proof of a waiver] is great." *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). That is in keeping with the importance of the right being waived. However, an express waiver is not required. *United States v. Hall*, 724 F.2d 1055 (2d Cir.1983). What is required is a clear showing of the intention, intelligently exercised, to relinquish a known and understood right. *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), citing *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 241–42, 87 L.Ed. 268 (1942). *See Tague v. Louisiana*, 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980). True, as defendant claims, silence alone would not constitute a waiver. What defendant did was to hear the recitation of his rights. He said he understood them. He made one or more statements. He can obtain no solace from the absence of a signed waiver for that is not the only effective manner of waiving the right. He did more than merely remain silent. By doing so, by making the statements with no suggestion he was forced to do so, with no indication of his doing so other than of his own free will, against the background of the warnings and his understanding of them immediately before he made, on two occasions, the incriminating statements, he is found to have waived his right to silence. He knew he did not have to speak and that what he said could be used against him. His choice not to remain silent but to speak was a conscious choice, freely made, to give up a known right. He is bound by the waiver.

Gonzalez' motion to suppress his statements made after his arrest is denied.

(3) Motion for Disclosure.

The defendants' motions for disclosure of *Giglio* and *Brady* material is granted, sub-

ject to the government's obligation to make such disclosure not later than one (1) week prior to jury selection. To that extent, the government's motion for a protective order is granted as well founded, based on the *in camera* review of the government's submission. The government's submission in support of its motion will remain under seal.

SO ORDERED.