UNITED STATES of America

v.

Matthew JOHNSON, Defendant.

No. 3:03 CR 121(JBA).

United States District Court, D. Connecticut.

Oct. 16, 2003.

James I. Glasser, Keith A. King, Kevin J. O'Connor, Robert M. Spector, U.S. Attorney's Office, New Haven, CT, for Plaintiff.

Thomas P. Belsky, Federal Public Defender's Office, New Haven, CT, for Defendant.

*Ruling on Defendant's Motion to Suppress [Doc. # 14]*

ARTERTON, District Judge.

Matthew Johnson is charged in a one count indictment with a violation of 18 U.S.C. § 922(g)(1) for possession of a firearm by a convicted felon. Johnson seeks to suppress statements he made to the police after his arrest, arguing that they were taken in violation of his constitutional rights under both the Fifth and Sixth Amendments.

The Court held an evidentiary hearing on the motion on October 3, 2003. For the reasons set forth below, the Court denies the defendant's motion.

## I. Factual Background

Matthew Johnson's arrest stems from a police investigation into Jonathan Bagon's theft of firearms from his grandfather's house. On March 23, 2003, Bagon, accompanied by his mother and grandfather, went to the Trumbull Police Department to report Bagon's theft of eleven firearms. *See* Transcript of Suppression Hearing, Oct. 3, 2003 [Doc. # 27] at 4; Gov't. Ex. 4. Bagon admitted to the police that he had stolen the guns from his grandfather's gun cabinets, and claimed that he had sold all of the guns to Johnson.[1] *See id.*

---

1. Though Bagon initially told police that    Johnson bought all eleven guns from him, he

Based on this information, on March 26, 2003, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Chad Campanell, Trumbull Police Detective Leonard Scinto, and Bridgeport Police Detective and ATF Task Force Agent Dwayne McBride went to interview Johnson at the Bridgeport Community Correctional Center, where Johnson was being held on a parole violation. *See id.* at 6. At this interview, Johnson signed a "Voluntary Interview Statement," stating his understanding that he had "the right to refuse, but freely choose[s] to be interviewed." *See* Gov't. Ex. 6. Neither the form nor the officers advised Johnson of his full Miranda rights. Johnson told the officers at this interview that he paid Bagon $50.00 as advance payment for a gun, but had never completed the purchase. *See* Tr. at 66–68. The government does not seek to admit this statement against Johnson at trial.[2]

On April 8, 2003, Scinto applied for a state arrest warrant, alleging that Johnson illegally possessed one of the firearms that Bagan stole from his grandfather. *See* Gov't Ex. 1. After the warrant was granted on April 16, 2003, Scinto applied for a habeas for Johnson's appearance in state court on April 24, 2003 so that he could serve Johnson with the warrant and have him arraigned. *See* Tr. at 45–46. When the marshalls failed to produce Johnson in court on April 24, 2003, Scinto applied for a second habeas, and Johnson was ordered

to be produced in court on May 1, 2003. *See id.* Meanwhile, on April 29, 2003, a federal grand jury returned an indictment also charging Mr. Johnson with unlawful possession of a firearm.

On May 1, 2003, Johnson was brought to state court in Bridgeport for arraignment on his state charges. Before the arraignment, shortly after 10:00 am, Detectives Scinto and McBride met Johnson in the holding facility at the courthouse in order to process him and interview him. *See* Tr. at 10–12, 58–59. As part of the booking process, Scinto took Johnson's fingerprints, photographed him, served the arrest warrant and described the charges, and gave Johnson a Notice of Rights form to review. *See id.* at 11–15.

The Notice of Rights form is a standard State of Connecticut Judicial Branch form that includes the following advisory:

1. You are not obligated to say anything, in regard to this offense you are charged with but may remain silent.

2. Anything you say or any statements you make may be used against you.

3. You are entitled to the services of an attorney.

4. If you are unable to pay for the services of an attorney, you will be referred to a Public Defender Office where you may request the appointment of an attorney to represent you.

---

later recanted and stated that Johnson bought only one gun from him.

**2.** Because the government does not seek to admit this statement, it is not necessary to determine whether Johnson was subjected to a "custodial" interrogation at this time, triggering *Miranda* safeguards. Also, assuming this was a custodial interrogation, the absence of *Miranda* warnings in obtaining these initial statements does not, in itself, taint the validity of Johnson's subsequent statements

made after receiving Miranda warnings. *See Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003) (" '[A]bsent deliberatively coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion' with respect to subsequent statements that the suspect makes after receiving Miranda warnings.") (quoting *Oregon v. Elstad*, 470 U.S. 298, 314, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)).

5. You may consult with an attorney before being questioned, you may have an attorney present during questioning and you cannot be questioned without your consent.

6. (Not applicable if you were arrested on a Superior Court Warrant which specified that bail should be denied or which ordered that you be brought before a clerk or assistant clerk of the Superior Court.) You have a right to be promptly interviewed concerning the terms and conditions of your release pending further proceedings, and upon request, counsel may be present during this interview.

Gov't. Ex. 2.

Scinto testified that when he handed Johnson the form, he advised Johnson that this was his "notice of rights," and told Johnson that he needed to "read one through six and sign at the bottom." *See* Tr. at 15. After Scinto gave Johnson these instructions, he observed Johnson looking down at the Notice of Rights form on the desk for "about a minute," which caused him to believe that Johnson was reading the form. McBride observed Scinto instruct Johnson to read and sign the Notice of Rights form, and testified that he thought Johnson took approximately "half a minute" to review the form, which was "longer than usual." *Id.* at 72. After reviewing the form, Johnson signed his name at the bottom, below a line stating "I have been advised of my rights as stated above and have received a copy of this notice." Ex. 2; *see also* Tr. at 16. The Notice of Rights form signed by Johnson is not dated, which Scinto testified was "an oversight" on his part, because he was "probably rushing to get the paperwork completed." *See* Tr. at 16.

Scinto testified that he did not read the rights aloud to Johnson, and did not ask Johnson if he understood his rights. *See* Tr. at 34. He also did not have Johnson sign his initials next to each of the six advisories in the Notice of Rights form, which was the practice of the Trumbull Police Department when administering a similar rights advisory form used before taking a written sworn statement. *See id.* at 35–38; Def. Ex. A. Further, Scinto testified that he did not expressly ask Johnson if he was willing to waive his rights, and the Notice of Rights form itself does not contain a place for a defendant to indicate that he is waiving his Miranda rights. *See id.* at 38; Def. Ex. A.

During the booking process, Johnson did not ask any questions, but made several statements about the facts of the case, such as that the statement the police obtained from Jennifer Kinsella, an acquaintance of Johnson's, was "a bunch of bullsh\**." *See* Tr. at 15–16, 73. After the booking process was completed, Detectives Scinto and McBride asked Johnson if they could speak with him, and Johnson agreed. *See id.* at 73. They escorted Johnson in handcuffs to a sheriff's office down the hall. *See id.* at 74–75. They passed a soda machine on the way, and McBride bought Johnson a Coke. *See id.* at 74. Inside the interview room, McBride sat behind a desk, and Scinto and Johnson sat in chairs across from the desk. *See id.* Johnson's handcuffs were removed prior to the start of the interview. *See id.*

The interview lasted approximately twenty to twenty-five minutes, which McBride testified was shorter than a typical witness interview. *See id.* at 20, 79. The primary purpose of the interview, according to McBride, was to obtain information from Johnson about the location of the other guns Bagan had stolen, which still had not been recovered. *See id.* at 70–71. McBride testified that he did most of the questioning, and began the interview by

explaining to Johnson that a federal indictment had just been returned against him for unlawful gun possession. In response to Johnson's questions, McBride discussed the difference between the state warrant and the federal indictment. *See id.* at 76–78. Both detectives testified that Johnson stated that the dual charges were "double jeopardy," *id.* at 42, 77, and McBride testified that he "explained to [Johnson] that it wasn't double jeopardy." *Id.* at 77. McBride also stated that Johnson asked hypothetical questions about the charges, such as "If I did buy the gun, federally what am I looking at or how much trouble could I be in and what would happen to the state charges?" *Id.* at 87–88.

In the course of the interview, McBride told Johnson that he believed what Johnson had told the officers during the March 26 interview at the Bridgeport Correctional Center about giving Bagan a $50.00 deposit for the gun, but that he believed "that the deal was consummated also." *See id.* at 80. Johnson did not acknowledge his earlier statements. *See id.* After twenty to twenty five minutes, McBride terminated the interview because he "felt [they] were getting nowhere," and told Scinto to get the marshals so that they could take custody of Johnson. *See id.* When Scinto left the room, McBride stood up, walked around the desk to where Johnson was sitting, and walked toward the door to open it. *See id.* at 81. Johnson also stood up, and asked McBride if he could talk to him again. *See id.* As McBride turned away from the door to face Johnson, Johnson "blurted out" that "[s]ometime in February I bought a gun from Jonathan Bagon." *See id.* at 81–82. McBride testified that he asked Johnson, "You feel better, don't you?" and that Johnson replied, "Yes, yes, I do, but I think I just f* * *ed up." *See id.* at 82. McBride then asked him why he waited until they were walking out the door to

make this admission, and Johnson responded that he had not wanted to make any admissions in front of the Trumbull police officer because the state charges came from Trumbull. *See id.* at 83. McBride testified that he did not question Johnson any further or attempt to obtain a fuller statement because it was time for Johnson's arraignment in court. *See id.* at 84. Instead, he told Johnson that they would talk more on May 7, the date Johnson was to be arraigned on his federal charges. *See id.*

Johnson was then placed in handcuffs, and one of the marshalls escorted him to a holding area to await his arraignment. *See id.* at 89. Johnson proceeded to be arraigned on the state charge, and later on the federal charge, and was appointed counsel. When Detective Scinto tried to interview Johnson after his federal arraignment, Johnson, represented by counsel, declined to be interviewed. *See id.* at 22.

## II. Discussion

It is undisputed that Johnson was subjected to a "custodial interrogation," and that the procedural safeguards of *Miranda v. Arizona*, 384 U.S. 436, 492, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), apply. These safeguards are derived from the Fifth Amendment, and rest upon the defendant's right not to be compelled to incriminate himself. *See Dickerson v. United States*, 530 U.S. 428, 434–435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Because Johnson had also been federally indicted at the time of the interview, his rights under the Sixth Amendment, which guarantees effective assistance of counsel, were also implicated by the questioning. *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) ("the right to counsel granted by the [Sixth Amendment] means at least that a person

is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment"); *Patterson v. Illinois,* 487 U.S. 285, 290, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) ("There can be no doubt that petitioner had the right to have the assistance of counsel at his postindictment interviews with law enforcement authorities. Our cases make it plain that the Sixth Amendment guarantees this right to criminal defendants.") (citations omitted).

■ Thus, under both the Fifth and Sixth Amendments, Johnson had the right not to speak to the police, and the right to have an attorney present. In order for Johnson's statements to be admissible against him, he must have validly waived those rights. The government "has the burden of establishing by a preponderance of the evidence" that Johnson validly waived his rights. *United States v. Ramirez,* 79 F.3d 298, 304 (2d Cir.1996); *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

■ In both the Fifth and Sixth Amendment contexts, the government must establish that the defendant's relinquishment of rights was knowing, intelligent, and voluntary. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Patterson,* 487 U.S. at 296, 108 S.Ct. 2389. Thus, a valid waiver is one in which the resulting incriminating statement is "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and in which the defendant "had a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *see also United States v. Scarpa,* 897 F.2d 63 (2d Cir.1990). In assessing

the defendant's comprehension and the voluntariness of the waiver, a court must examine the "totality of the circumstances surrounding the interrogation," *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), including the "background, experience, and conduct of the accused." *North Carolina v. Butler,* 441 U.S. 369, 374–375, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).

As Johnson argues in his supplemental memorandum in support of his motion to suppress, "[t]he thrust of [his] claim is that he did not validly waive his rights because he did not fully comprehend them, and more importantly, the consequences of waiving them." *See* Def.'s Supp. Mem. Sup. Mot. Suppress [Doc. # 29] at 4. In particular, Johnson argues that the detectives did not ensure that Johnson understood his rights, because they admittedly were "rushing" to complete the booking process and interview Johnson before his arraignment, and although they did not know whether Johnson could read English, they did not read the Miranda advisories aloud to him, have Johnson read the Notice of Rights form aloud, or have Johnson initial next to each right on the Notice of Rights form. Moreover, Johnson argues he did not understand that what he told the detectives could be used against him in both the state and federal proceedings, since he was primarily concerned with the state charges, as he was in state court for his arraignment on the day of the interview. In support, he states that the fact that he made an incriminating statement to Detective McBride, but refused to make any admissions in front of Detective Scinto, are indications that he believed what he told McBride could not be used against him in his state case. On the basis of

these facts, Johnson argues that a waiver cannot be "clearly infer[red]." *See id.*

It is undisputed that Johnson did not expressly waive his Miranda rights, as neither detective asked Johnson if he wished to waive his rights, and the Notice of Rights form does not contain a waiver provision. It is well established, however, that an express waiver is not constitutionally required. As the Supreme Court in *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) explained:

> An express written or oral statement of waiver of the right to remain silent or of the right to counsel is unusually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

Thus, while "merely answering questions after Miranda warnings have been given does not necessarily constitute a waiver," *United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir.1990), a court may look to all of the particular facts and circumstances of the case to infer a valid waiver. As Johnson correctly states, the inference must be "clearly" established. *See Butler*, 441 U.S. at 373, 99 S.Ct. 1755; *see also Scarpa*, 897 F.2d at 68–69 (affirming district court's

finding of an implied waiver when evidence showed the defendant "consistently chose to confront law enforcement officers without assistance," negotiated inside his motel room with DEA agents for 45 minutes without contacting an attorney, though he had previously worked with lawyers); *United States v. Hall*, 724 F.2d 1055, 1060 (2d Cir.1983) (affirming district court's finding of an implied waiver when defendant confessed after agreeing to "get to the bottom of the situation," and reflecting on the evidence against him); *United States v. Rubio*, 709 F.2d 146, 152–53 (2d Cir.1983) (affirming district court's finding that defendant waived his rights based on district court's "evaluation of the actions and words of the accused," even though the agent failed to remember if the defendant stated he understood the Miranda warnings); *United States v. Boston*, 508 F.2d 1171, 1175 (2d Cir.1974) (affirming district court's finding of waiver when defendant exercised his Miranda rights until he was confronted with the results of a search of his apartment, though defendant refused to sign waiver of rights form).

Here, the facts surrounding Johnson's pre-arraignment interview allow a clear inference that Johnson waived his Miranda rights, and establish that this waiver was knowing and intelligent. First, the evidence indicates that Johnson was properly advised of his Miranda rights, as he was provided with a standard, legally sufficient "Notice of Rights" form, reviewed it for what the detectives estimated to be half a minute to a full minute, and signed at the bottom, attesting "I have been advised of my rights as stated above and have received a copy of this notice." Gov't Ex. 2. It was apparent that Johnson understood English, as he spoke to the detectives during the booking process and the detectives had already interviewed him approximately one month earlier. *See* Tr. at 66. Moreover, the evidence indicates

that Johnson was able to read and in fact read the Notice of Rights form, for he did not reflexively sign the Notice of Rights, but reviewed its contents for what McBride deemed to be "longer than usual." According to McBride, Johnson's more careful review of the rights form was unlike most accused persons to whom he had provided the form, who "skim through it and just sign it." *Id.* at 72.

■ The fact that the detectives did not read the Miranda rights aloud to Johnson, or ask him to initial next to each right, is not fatal in this context. "Miranda does not require the interrogator to ask the suspect whether the latter understood each of the rights, although it is doubtless good police practice to do this when the circumstances permit." *United States v. Hall*, 724 F.2d 1055, 1059 (2d Cir.1983); *see also United States v. Anderson*, 929 F.2d 96, 98 (2d Cir.1991) ("We review the warnings not for whether they adhered to a certain form, but for their substance. We must ascertain if Anderson had his Miranda rights brought home to him in an intelligible fashion.") (citations omitted). Oral warnings, therefore, are not required. *See United States v. Sledge*, 546 F.2d 1120, 1122 (4th Cir.1977) (noting agreement among circuits to have considered the issue that "it is not essential that the warnings required by *Miranda v. Arizona* . . . must be given in oral rather than written form.") (citing *United States v. Coleman*, 524 F.2d 593 (10th Cir.1975); *United States v. Alexander*, 441 F.2d 403 (3rd Cir.1971); *United States v. Van Dusen*, 431 F.2d 1278 (1st Cir.1970); *United States v. Osterburg*, 423 F.2d 704 (9th Cir. 1970)).

In addition, Johnson's actions demonstrate his general understanding of the consequences of talking to the detectives. Johnson did not make any admissions in the course of the interview, remained silent in response to McBride's statement that he believed that Johnson completed the purchase of the gun from Bagan, and carefully phrased his inquiries about the consequences of the charges as hypothetical questions. During the interview, Johnson commented on the veracity of the government's witnesses against him, and expressed familiarity with the facts of the case. But it was only after the termination of the interview, when Scinto had left the room and McBride was opening the door, that Johnson asked McBride if they could talk, and admitted to purchasing a gun from Bagan. McBride testified that when making this admission, Johnson "looked like he wanted to get something off his chest," and that "he looked like he felt better after saying that." *Id.* at 82. When McBride asked him, "You feel better, don't you," Johnson responded affirmatively but also indicated he thought he made a mistake. *See id.*

Moreover, there is considerable evidence that Johnson understood in particular that his statements to Detective McBride could be used against him in federal court. While Johnson talked to McBride after refusing to incriminate himself when Scinto was in the interview room, and stated that he did not wish to talk to Detective Scinto because the charges against him came from the Trumbull Police Department, Johnson was clearly aware both of the federal charges and of McBride's involvement in the federal investigation. McBride was the officer who informed him about the federal indictment that had recently been returned, and who told him about the May 7 arraignment date in federal court. *See id.* at 75–76. Johnson, responding to this information, asked McBride numerous questions about the implications of the dual state and federal charges, and stated: "This is double jeopardy." *Id.* at 77. By using this legal phrase in the context of a dual prosecution for the same crime, Johnson demonstrated a clear understanding that both the federal

and state charges against him remained pending. He was informed by Detective Bride that the dual federal and state charges did not constitute double jeopardy. Further, Johnson specifically asked McBride about the consequences of the federal charges, hypothetically inquiring: "If I did buy the gun, federally what am I looking at or how much trouble could I be in and what would happen to the state charges?" *Id.* at 87–88. Finally, after Johnson incriminated himself before McBride, he stated, "I think I just f* * *ed up," *see id.* at 82, evidence of his subjective understanding that McBride might be able to use his admission against him.

On these facts, the preponderance of the evidence supports the conclusion that Johnson understood the consequences of his statement to McBride. Having received the Miranda warnings, which categorically state that "Anything you say may be used against you," Johnson's decision to make an admission to McBride, upon reflection, after initially asserting his right not to incriminate himself, constitutes a knowing and intelligent waiver of his rights.[3]

### III. Conclusion

For the reasons set forth above, the defendant's motion to suppress [Doc. # 14] is DENIED.

IT IS SO ORDERED.

---

**3.** At the evidentiary hearing and in his supplemental memorandum of law, Johnson did not allege coercion or challenge the voluntariness of his confession. In light of the brevity of the interview, the fact that Johnson's handcuffs were removed prior to questioning, and the fact that Johnson was provided with a soda to drink, the conditions of the interview were appropriate, and there is no evidence that Johnson had any mental disabilities or other infirmities that might have made him more susceptible to influence in police interrogation, or that the detectives made material misrepresentations or otherwise coerced Johnson. On these grounds, the court also finds that Johnson's statement was voluntarily provided.