**UNITED STATES of America**

**v.**

**Kenneth CREWS, Defendant.**

**No. 3:01CR146(JBA).**

United States District Court,
D. Connecticut.

Nov. 15, 2001.

John H. Durham, James I. Glasser, Deborah R. Douglas, U.S. Attorney's Office, New Haven, CT, for Plaintiff.

Roger H. Sigal, Federal Public Defender's Office, New Haven, CT, for Defendant.

*Ruling on Defendant's Motion to Suppress [Doc. # 19]*

ARTERTON, District Judge.

Kenneth Crews is charged in a one-count indictment with retaliating against a federal informant who provided information to federal agents in their narcotics prosecution of Crews's brother, Anthony Chavis. Crews seeks to suppress several statements made after his arrest but before his arraignment, arguing that they were taken in violation of his constitutional rights under both the fifth and sixth amendments.

The Court held an evidentiary hearing on the motion, and for the reasons set out below, the Court will grant the defendant's motion as to all statements except one.

## I. Factual Background

### A. Crews and Chavis

Anthony Chavis is Crews's brother, and is currently awaiting sentencing in this District on a narcotics charge. Crews is not a defendant in the narcotics case against Chavis. The government alleges that Crews approached and threatened an informant in the Chavis case. On June 27, 2001 a grand jury returned a one-count indictment charging Crews with violating 18 U.S.C. § 1513, which prohibits retaliating against a witness, victim, or informant.

After Crews was arrested and taken into custody on the above charge, two deputized federal agents questioned him about the charges against his brother, and later about the alleged retaliation incident. Prior to the questioning, they read him Miranda warnings and made some inquiry into whether he understood his rights and wished to answer their questions. During the questioning, Crews made several statements regarding his knowledge of his brother's activities related to narcotics and the monetary proceeds therefrom, and statements about the alleged retaliation incident.

The government seeks to use Crews's statements about his knowledge of his brother's narcotics activities against him at Crews's trial on the theory that the statements show that Crews, although unindicted, was part of the narcotics conspiracy, and therefore his motive in allegedly threatening the informant was perpetuation of the conspiracy.

Crews objects to the introduction of this testimony on two grounds. First, he argues that it was obtained in violation of his fifth and sixth amendment rights. Second, he argues that it is irrelevant and prejudicial. In light of the Court's disposition on the first ground, the second is not addressed.

### B. The Questioning of Kenneth Crews

Crews was arrested on July 20, 2001 at the Crowne Plaza Hotel in Hartford where he works as a cook, by Richard Rohner and Richard Waltrous. Rohner and Waltrous are police officers who have been deputized as agents of the federal Drug Enforcement Administration from their respective police departments. At the Crowne Plaza, the agents told Crews what would occur next: he would first be taken to the Hartford district office to be fingerprinted and photographed, and would then be transported by car to New Haven, where he would be arraigned. While Crews does not recall this fact, both agents testified that at the Crowne Plaza

Hotel, he was told that a lawyer would represent him at his arraignment in New Haven.

As Crews was being processed in Hartford, Rohner told him that he had some questions for Crews that he would ask later. The agents allowed Crews to make one telephone call in Hartford, which he made to his girlfriend, although he understood that had he so desired, he could have telephoned an attorney at that time.

After arrest processing in Hartford was completed, the agents drove Crews to New Haven. Rohner drove the car and Waltrous sat in the back seat behind Crews, who sat in the front passenger seat, in handcuffs. During the trip, the agents questioned Crews for the first time.

Waltrous borrowed Rohner's pocket Miranda card, and read verbatim the following warning:

> The constitution requires that I inform you of your rights: You have a right to remain silent. If you talk to any police officer, anything you say can and will be used against you in court. You have a right to consult with a lawyer before you are questioned, and may have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you, if you wish, before any questioning. If you wish to answer any questions, you have the right to stop answering at any time. You may stop answering questions at any time if you wish to talk to a lawyer, and may have him with you during any further questioning.

Gov't Ex. 1.

Crews recalls only portions of the warning, explaining that he was in a daze from the shock and circumstances of his arrest.

After reading the above warnings, Waltrous asked Crews if he understood his rights, if he waived his rights, and if he wished to speak with the agents about the charges against his brother:

> Those three questions I asked were: Do you understand your rights, to which he stated yes. I said, do you want to waive your rights, meaning do you wish to talk to us? He said yes. And I says, will you talk to us or do you want to talk to us about this case involving your brother? He said yes.

Tr. 63 (testimony of Agent Waltrous).

The testimony at the evidentiary hearing revealed that given their respective positions in the car, neither agent was in a position to actually see Crews and evaluate his demeanor and state of mind as he was read the Miranda warnings and as he responded to the agents' questions after the card was read.

Agent Waltrous further testified that although both his local police department and the DEA have written Miranda waiver forms that are to be used as a matter of course to contemporaneously memorialize a defendant's comprehension and waiver of his right to silence and counsel, they did not use such a form because they were pressed for time and having Crews sign the form in the car was too cumbersome:

> I believe we were in a rush for time. We wanted to get the defendant down here in the vehicle, so we got him in the car. Whether or not we had a [written waiver] form with us, I don't recall . . . . And he was also handcuffed. We didn't want to pull over to the side of the road, get him out of the car, unhandcuff him, pull out the form and have him sign it, and get back in the car.

Tr. 60 (testimony of Agent Waltrous).

However, Waltrous also testified that he and Agent Rohner planned well before the car trip to question Crews in the car on the way to New Haven, prior to his ar-

raignment, where counsel would be appointed:

The Court: [B]efore the trip between Hartford and New Haven, you and Agent Rohner had agreed you would question Mr. Crews.

The Witness: Yes, your Honor, we knew it would be approximately an hour drive maybe. The *day before* we [arrested Mr. Crews], Agent Rohner mentioned to me he would like to question him on the car ride down.

Tr. 59–60 (testimony of Agent Waltrous) (emphasis added).

## II. Analysis

### A. Constitutional Rights Implicated

■■■■ Given the fact that Crews was interrogated while in police custody, the procedural safeguards of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), apply. *Miranda* is a prophylactic constitutional rule that is derived from the fifth amendment, because it implicates a defendant's right not to be compelled to give testimony against himself. *See Dickerson v. United States*, 530 U.S. 428, 434–435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

■■■■ At the time of the questioning, Crews had already been indicted. Indictment marks the commencement of formal adversarial judicial proceedings, and thus Crews's rights under the sixth amendment, which guarantees effective assistance of counsel, were also implicated by the questioning. *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) ("the right to counsel granted by the [sixth amendment] means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—whether by way of formal charge, preliminary hearing, indictment, informa-

tion, or arraignment"); *Michigan v. Jackson*, 475 U.S. 625, 630, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) (after indictment, "government efforts to elicit information from the accused, including interrogation, represent 'critical stages' at which the Sixth Amendment applies") (citations omitted).

The Supreme Court recently held in *Texas v. Cobb*, 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001), that the sixth amendment's right to counsel is "offense specific" and only applies to questioning about the offense charged in the formal adversarial judicial proceedings. Here, Crews's sixth amendment right to counsel attached as to any questioning about the retaliation charge on which he was indicted. While much of the questioning in this case involved Crews's knowledge of his brother's drug case, the *Cobb* rule is not implicated because the government, by its own admission at oral argument, was attempting to procure (and did in fact procure) the information about Crews's knowledge of the narcotics activities in an attempt to supply a motive for the retaliation offense.

Thus, under both the fifth and sixth amendments, Crews had the right not to speak to the federal agents without his attorney present. In order for Crews's statements to be admissible against him, he must have validly waived that right. The burden is on the government to prove waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

### B. Waiver

■■■■ The standard for waiver is the same under both the fifth amendment and the sixth amendment. *Patterson v. Illinois*, 487 U.S. 285, 296, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). "[A] valid waiver will not be presumed simply from the silence of

the accused after [*Miranda*] warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda*, 384 U.S. at 475, 86 S.Ct. 1602. Rather, the strict 'knowing and intelligent' waiver standard of *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), applies. *Gilchrist v. O'Keefe*, 260 F.3d 87, 95 (2d Cir.2001) ("the Supreme Court's 'knowing and intelligent' waiver standard applies to constitutional rights generally, not solely to the [sixth amendment] right to counsel"), *citing Johnson*, 304 U.S. at 464, 58 S.Ct. 1019; *Davis v. United States*, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) ("[t]he right to counsel recognized in *Miranda* is sufficiently important to suspects in criminal investigations . . . that it 'requires the special protection of the knowing and intelligent waiver standard' "), *quoting Edwards v. Arizona*, 451 U.S. 477, 483, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

 Under *Johnson*, "courts indulge every reasonable presumption against waiver of fundamental constitutional rights and . . . do not presume acquiescence in the loss of fundamental rights":

> A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to Counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.

304 U.S. at 464, 58 S.Ct. 1019 (internal quotations and citations omitted).

 "[T]he key inquiry" in determining whether a defendant waived his rights during questioning is whether the defendant was "made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel." *Patterson*, 487 U.S. at 292–293, 108 S.Ct. 2389.[1]

1. Express Waiver

After reading Crews his *Miranda* warnings, Agent Waltrous asked Crews if he understood his rights, if he wished to waive his rights, and if he wished to speak with the agents about the Chavis case. Waltrous testified that Crews answered each question in the affirmative.

 While Crews's affirmative answers to these questions might permit a finding of waiver, such a finding is not compelled solely by virtue of those answers. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (express oral statement of waiver of the right to remain silent or of the right to counsel is not inevitably sufficient to establish waiver). In this case, Crews's answer to the question "Do you wish to waive your rights?" has no probative value on the question of waiver because the testimony at the evidentiary hearing revealed that Crews simply does not know what the word "waive" means:

> The Court: What does the word "waive" mean? If someone said you waive your rights, what does waive mean?

---

1. While police coercion may be a necessary predicate to a challenge based on the *voluntariness* of a waiver, *see Connelly*, 479 U.S. at 169–170, 107 S.Ct. 515, a purported waiver is invalid even absent police coercion if the defendant did not comprehend his or her rights. David M. Nissman & Ed Hagen, Law of Con- fessions (2d ed., 1994), § 6.6; *see also Connelly*, 479 U.S. at 171 n. 4, 107 S.Ct. 515 (noting that Colorado Supreme Court on remand could address whether Connelly's waiver was invalid on grounds other than voluntariness, with its official coercion prerequisite).

The Witness: Waive mean I don't have to do what they asked me or answer, whatever they are asking me.

The Court: So, if you were told you had the right to remain silent, you had the right to have counsel and so forth, and then they said do you waive your rights, what does the [word] "waive" mean in that context?

The Witness: I didn't have to answer their questions.

\* \* \* \* \* \*

The Court: Is there a difference in your mind between whether you understand your rights and whether you waive the rights? Are they the same thing or are they different?

The Witness: Waive, I know I don't have to answer anything, and understanding is do I know the meaning of what they saying.

\* \* \* \* \* \*

The Court: When you were in the car with the agents, did they say anything that you understood to mean are you giving up your right to remain silent and to be represented by an attorney while you are being questioned?

The Witness: Did they say anything?

The Court: About giving up your rights to remain silent, all the rights that they had just read?

The Witness: No.

Tr. 112–114 (testimony of Kenneth Crews).

During the above colloquy, it was clear from Crews's deportment and demeanor on the stand that there was no connection in his mind between the word "waive" and the Court's subsequent use of the phrase "giving up." Given the testimony at the hearing, the Court finds that the government has not established by a preponderance of the evidence that Crews expressly waived his rights.

## 2. Implied Waiver

 "An express written or oral statement of waiver of the right to remain silent or of the right to counsel … is not inevitably either necessary or sufficient to establish waiver." *Butler*, 441 U.S. at 373, 99 S.Ct. 1755. While "mere silence is not enough[,] the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may … support a conclusion that a defendant waived his rights." *Id.; accord United States v. Ming He*, 94 F.3d 782, 794 (1996) ("Only if silence is joined with some showing that [the] defendant, having comprehended his rights, nonetheless thereafter followed a course of conduct suggesting an abandonment of his entitlement to counsel, may an implied waiver be found").

In *United States v. Hall*, 724 F.2d 1055 (2d Cir.1983), the Second Circuit, applying *Butler*, affirmed the district court's refusal to suppress statements made without an explicit waiver of *Miranda* rights. Hall, a previously-convicted bank robber, was approached by McCrary, an FBI agent. McCrary recited the *Miranda* warnings to Hall, and Hall later made incriminating statements without ever having affirmatively waived his rights.

The Court of Appeals held that the circumstances of the case pointed strongly to waiver: after being told of his rights, Hall "voiced agreement with Agent McCrary's plan to 'get to the bottom of the situation' including his own position as a suspect." Further, the court found it relevant that he calmly reflected on the situation, and that he was no stranger to the criminal justice system.

The Second Circuit revisited non-explicit waivers of *Miranda* rights in *United States v. Scarpa*, 897 F.2d 63 (2d Cir.1990). Scarpa, an organized crime figure, was arrested in a hotel room after holding po-

lice at bay for 45 minutes. When the DEA agent began reading him his rights, Scarpa interrupted the agent and said he understood and the agent did not have to proceed, although the agent continued anyway. The next day, the same DEA agent was driving Scarpa to a federal courthouse, and Scarpa made incriminating statements on the journey. The conversation in the car was "relaxed and friendly."

The Court of Appeals agreed with the district court that Scarpa, no stranger to law enforcement, had "a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 69, *quoting Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). The court based its conclusion on the fact that Scarpa had previously worked with lawyers, was confident in his own ability to deal with law enforcement officers, and the fact that the car ride had been "relaxed and friendly."

The court in *Hall* and *Scarpa* looked at the totality of the circumstances in order to determine whether waiver was "clearly inferred" from the actions and words of the defendants. The inquiry was fact-intensive, and focused principally on whether the defendant understood his rights and the consequences of waiving them.

 Applying the constitutional principles to the facts as found in this case,[2] the Court finds that the government has failed to establish by a preponderance of the evidence that Crews impliedly waived his rights, because the government has not shown that after comprehending his rights, Crews "nonetheless thereafter followed a course of conduct suggesting an

abandonment of his entitlement to counsel." *Ming He,* 94 F.3d at 794.

The agents read Crews his Miranda warnings, and he stated that he understood his rights. Next they inquired about "waiver," but as discussed above, asking Crews whether he "waived" his rights was akin to asking the question in Greek. Finally, the agents asked Crews whether he wished to answer questions about his brother's case:

> The Court: You said do you want to talk to us about your brother's case. Is that what you mean by do you want to waive your rights, or was there another question?
>
> The Witness: There were three questions that I asked: Do you understand your rights, do you wish to waive your rights, and do you want to talk to us. When I said do you want to talk to us, I mentioned specifically do you want to talk to us about the case.
>
> The Court: The Chavis case.
>
> The Witness: That is correct.

Tr. 67 (testimony of Agent Waltrous).

The government has not established by a preponderance of the evidence that Crews, by telling the agents that he would answer their questions about his brother's case, engaged in a course of conduct indicating an intent to waive his rights. Crews was not (and is not now) under indictment in the Chavis narcotics case, and the fact that the government now seeks to use his answers about his brother's activities and sources of income against him on an attenuated motive theory in his retaliation prosecution would not have been at all apparent to him.

---

**2.** "[T]he question of waiver [is] not a question of historical fact, but one which ... requires 'application of constitutional principles to the facts as found.'" *Brewer,* 430 U.S. at 403, 97

S.Ct. 1232, *quoting Brown v. Allen,* 344 U.S. 443, 507, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (separate opinion of Frankfurter, J.).

Certainly, if Crews was speaking with them after a valid waiver, the agents would not be obliged to explain to Crews how each of their questions related to his case. For example, after a valid waiver the police could engage a suspect in a conversation about a topic as mundane as a baseball game, and then use his statement that he saw the game on television at his home as evidence of some element of the government's case against him, such as opportunity. This investigative technique, however, is wholly separate from the question of waiver: it seems almost nonsensical to say that by discussing baseball with the police, the suspect was knowingly and intelligently waiving his right to counsel. *Cf. Miranda*, 384 U.S. at 475, 86 S.Ct. 1602 ("a valid waiver will not be presumed simply from . . . the fact that a confession was in fact eventually obtained").

 Stated differently, circumstances may exist in which a defendant's decision to speak, when considered in light of his understanding of his rights and the ramifications of relinquishing them, may demonstrate a knowing and intelligent waiver. In *Hall*, for example, the suspect (who was no stranger to the criminal justice system) was told of his rights, and after reflecting calmly on the situation, voiced agreement with the agent's plan to 'get to the bottom of the situation' including Hall's own position as a suspect. In that case, Hall's decision to speak, when considered in the totality of the circumstances, was sufficient evidence from which the district court could conclude that his course of conduct indicated a knowing and voluntary waiver of his rights. The same cannot be said of Crews's course of conduct in answering the agents' ambiguous questions about his brother's sources of income, when Crews was charged with threatening an informant.

It is also noteworthy that at the time of his questioning, Crews was off-balance and troubled by his arrest and being taken into custody at his place of employment. He was preoccupied with fear that he would lose his job as a cook, which he had held for five years, and concerned about whether he would be detained following arraignment.

Additionally, prior to this occasion Crews had never in the past been read his Miranda rights, and was thus something of a stranger to custodial interrogation.[3]

Finally, the agents specifically waited to question Crews until he was in a car traveling on an interstate highway: from Crews's perspective, he was with the agents in a one hour car ride, and even assuming he understood that he had the right to not talk about the charges pending against him, it would have been difficult for him to imagine how he could avail himself of an attorney as the agents asked him questions.

For all of these reasons, the government has failed to establish by a preponderance of the evidence that Crews waived his constitutional rights.

## C. Volunteered Statements

 While the fifth and sixth amendments have different requirements for what constitutes police action necessary to trigger the safeguards of each amendment, *Rhode Island v. Innis*, 446 U.S. 291, 300 n. 4, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), neither amendment is violated where the defendant volunteers a statement in the absence of questioning, encouragement, or deliberate elicitation by law enforcement

---

**3.** Crews has been arrested twice before, but testified that he was never interrogated or Mirandized during either arrest.

personnel. *See id.* at 301–302, 100 S.Ct. 1682 ("since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response") (footnote omitted) (applying the fifth amendment, which requires interrogation as defined above); *Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (to trigger applicability of sixth amendment protections "the defendant must demonstrate that the police ... took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks").

 Based on the evidence presented at the hearing, the Court finds that Crews's statement that he "[couldn't] believe [that he was] being arrested for something like this," Tr. 109, was made spontaneously and was not a result of police questioning or police conduct reasonably likely to elicit an incriminating response. Thus, this statement is admissible at trial.

While the record is unclear as to the exact conversation that took place after this spontaneous statement, it is clear that further statements made by Crews in the car were made in response to questioning and statements by the agents. Because there was no valid waiver, these statements are inadmissable.[4]

III. Conclusion

For the reasons set forth above, the defendant's motion to suppress [Doc. # 19] is GRANTED IN PART AND DENIED IN PART. All statements made by Kenneth Crews to Agents Rohner and Walt-

rous during the automobile trip to New Haven are suppressed, with the exception of the volunteered statement identified above.

IT IS SO ORDERED.

---

**4.** Some of these statements may have been made on another occasion, prior to Crews's arrest. Nothing in this decision precludes the government from offering Crews's statements made prior to his arrest into evidence at Crews's trial.